656 P.2d 1213 (1983)
Arthur K. WETTANEN, Appellant,
v.
STATE of Alaska, Appellee.
No. 6352.
Court of Appeals of Alaska.
January 14, 1983.
*1214 Stephen C. Cowper, Dick Madson, Cowper & Madson, Fairbanks, for appellant.
Peter A. Michalski, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.
Before BRYNER, C.J., and COATS and SINGLETON, JJ.

OPINION
SINGLETON, Judge.
Arthur K. Wettanen was convicted of assault in the first degree. AS 11.41.200(a)(1) (assault with a dangerous instrument). He appeals contending that the trial court erred in finding that a bare or unshod foot was a "dangerous instrument," that there was insufficient evidence that his blow caused his victim's injuries and finally that there was a fatal variance between the indictment which charged that Wettanen kicked Harrison with his shod feet and the proof at trial which failed to show what footgear, if any, Wettanen was wearing. We affirm.
On March 27, 1981, Arthur K. Wettanen and Edward Harrison, fellow employees of Peter Kiewitt Construction Company, were working on the Tanana drainage project outside the city of Fairbanks, Alaska. Wettanen, a member of Operating Engineers Local 302, drove a bulldozer. Harrison, a Teamster, was employed to service heavy equipment by, for example, supplying antifreeze and coolants to bulldozers. Wettanen believed that the work Harrison was doing was actually operating engineers' work and should not be performed by Teamsters. On one occasion, he remonstrated with Harrison, demanding that he cease work but Harrison continued to work. Wettanen thereafter took stronger measures. He attacked Harrison from behind, knocked him down, and then beat Harrison with his fists and kicked him with his feet. Harrison did not defend himself but rolled into a ball until other employees dragged Wettanen away from him. As a result of the attack, Harrison was hospitalized with headache, blurred vision, abrasions and bleeding cuts on the right side of his face and head. More significant, Harrison's eighth and ninth ribs on his right side were fractured. His right lung had partially collapsed from a puncture wound (presumably caused by a broken rib) and there was fluid in his chest cavity. Doctor James A. Lundquist, Harrison's treating physician, testified that the act of kicking someone in the ribs while wearing relatively light footwear or even bare feet is capable of puncturing a lung and thereby causing serious physical injury. Wettanen was prosecuted under AS 11.41.200(a)(1) which provides:

Assault in the first degree. (a) A person commits the crime of assault in the first degree if
(1) with intent to cause serious physical injury to another person, he causes physical injury to any person by means of a dangerous instrument ...
Wettanen waived jury trial and the case was heard by Judge Van Hoomissen. Judge Van Hoomissen found that Wettanen intended to cause serious physical injury to *1215 Harrison, that he caused Harrison physical injury and that, under the circumstances in which they were used, Wettanen's feet were "dangerous instruments." The trial court agreed with Wettanen that there was no evidence in the record describing the particular footgear, if any, that Wettanen was wearing. The court held that it was unnecessary for the state to establish the particular footgear Wettanen was wearing in light of AS 11.81.900(b)(11) which provides:
(b) As used in this title, unless otherwise specified or unless the context requires otherwise,
(11) "dangerous instrument" means anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is capable of causing death or serious physical injury ....
Wettanen does not question the sufficiency of the evidence to show that he intended to cause Harrison serious physical injury. He does argue that there was insufficient evidence that he in fact caused the injuries described by Dr. Lundquist. We disagree. There was substantial evidence that Wettanen beat and kicked Harrison. Harrison was taken to the emergency room almost immediately thereafter where his injuries were diagnosed. Dr. Lundquist testified that the injuries were compatible with the beating described. Under these circumstances, we hold that the trial court's finding that Wettanen caused Harrison physical injury beyond reasonable doubt was not clearly mistaken.
Wettanen's primary argument is that he did not use a dangerous weapon. Specifically, he argues that the trial court found that there was no evidence from which a fact finder could determine the nature and attributes of the footgear Wettanen was wearing at the time of the assault. He relies on Ransom v. State, 460 P.2d 170 (Alaska 1969), which held:
We believe that bare hands and feet can not ordinarily be dangerous weapons. It is true that a blow with a bare hand or foot can cause serious bodily injury under certain circumstances. However, since Alaska does not have an aggravated assault statute such a blow by an ordinary person must be classified as a misdemeanor assault. If a person were wearing a soft leather glove a blow from his fist could still cause serious bodily injury; yet the possibility of injury would not be attributable to the use of the glove but rather to the fist itself. Such a case would still be a misdemeanor assault. For the crime of assault with a dangerous weapon to be shown, it must appear that the use of the weapon, rather than just the blow, had the capability of producing serious bodily injury considering the manner in which it was used. Thus, we believe that most types of ordinary wearing apparel cannot be dangerous weapons. Yet, under some circumstances a heavysoled boot such as used in the Berfield case [Berfield v. State, 458 P.2d 1008 (Alaska 1969)], could be a dangerous weapon. As we stated in Berfield, whether an object is a dangerous weapon depends upon the object's capability for harm considering the manner of its use. If nothing is known of the object's physical characteristics, its capability for harm cannot be reasonably determined.
460 P.2d at 171-72 (footnotes omitted).
The trial judge held that Ransom had been superceded by enactment of our new criminal code under which "anything" could be a "dangerous instrument" depending upon the manner of its use. AS 11.81.900(b)(11). The trial court specifically noted that this was the view of the former statute taken by Justice Rabinowitz in his dissenting opinion in Ransom.
It is highly unlikely that Wettanen was outside a building walking around in Fairbanks in March barefoot, let alone that he was driving heavy equipment without any foot covering. While we believe that reasonable fact finders could differ on this question, we are bound by the trial court's conclusion that he could not make the comparison required by Ransom between the kicks administered to Harrison by Wettanen as if he was shod and the same kicks *1216 administered by Wettanen assuming he was barefoot. Thus, given the trial court's finding, it cannot be determined whether whatever footgear Wettanen was wearing increased the risk his kicks presented to Harrison. If Ransom is still good law, then Wettanen's conviction must be reversed. We have concluded that Ransom is not applicable to prosecutions under the new code. A number of considerations lead us to this conclusion.
First, Ransom was prosecuted under former Alaska statutes which punished an assault by one "not armed with a dangerous weapon" as a misdemeanor subject to a six-month penalty. Former AS 11.15.230. The same code distinguished between two types of "armed" assault. Where the assailant was "armed with a dangerous weapon" and used the weapon in the assault, he was guilty of assault with a dangerous weapon and subject to imprisonment for up to ten years. Former AS 11.15.220. This was the statute which Ransom allegedly violated. Where the assailant was armed with a dangerous weapon and used the weapon to intimidate his victim but not to assault his victim, he was guilty of assault while armed and also subject to imprisonment for up to ten years. Former AS 11.15.190. While the phrase "armed with a dangerous weapon" connotes something the assailant can pick up and put down, the current code reference to injuries produced "by means of a dangerous instrument" does not suggest a separation between the instrument and the assailant.
More significantly, the term "dangerous weapon" used in former AS 11.15.220 was not defined in the former code while "dangerous instrument" is defined in the new code. AS 11.81.900(b)(11). The definition is taken with a minor modification from the New York Penal Code which, in turn, is based upon the Model Penal Code.
Model Penal Code § 210.0(4) provides:
"deadly weapon" means any firearm, or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury.
The New York Penal Code of 1965 upon which our code is more closely patterned deviates from the Model Penal Code in distinguishing between "deadly weapons" and "dangerous instruments." The latter is defined in § 10.00(13) as follows:
"Dangerous instrument" means any instrument, article or substance, including a "vehicle" as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury.
As previously indicated, the Alaska Revised Code substitutes the term "anything" for "any instrument, article or substance, including a vehicle," etc. In discussing the New York provision, Arnold Hechtman, author of the Practice Commentaries which are compiled with the New York Penal Code to aid in its interpretation, writes the following:
Subdivision 12 defines a "deadly weapon" by listing a few specific lethal instruments of a kind that ordinarily are manufactured or designed as "weapons" and have virtually no other purpose....
In contrast to a "deadly weapon," a "dangerous instrument," which is not necessarily designed as a weapon and ordinarily has a perfectly legitimate function, is defined, in subdivision 13, not in terms of specific items or attributes but in terms of temporary use. It would be futile to attempt to define a "dangerous instrument" in absolute terms  as, for example, one which is capable of producing death or serious physical injury  for this would apply to almost every item on earth (e.g., a fountain pen is capable of producing blindness if jammed in a person's eye). Accordingly, this subdivision designates "any instrument, article or substance" as "dangerous" when used, or attempted or threatened to be used, in a manner rendering it "readily capable of causing death or other serious physical injury." The implications of this definition, *1217 in conjunction with that of a "deadly weapon," appear prominently in the burglary and robbery areas. The culprit who has a pistol or a blackjack on his person in the course of such a crime becomes, by that fact alone and regardless of use thereof, guilty of first degree robbery or, as the case may be, of burglary in at least the second degree; but his possession of, for examples, a pen knife or even a bludgeon, cane sword or chuka stick is not a degree raising factor unless he uses it or attempts or threatens to do so.
N.Y. Penal Law § 10.00 (McKinney's Consol. 1975) commentary at p. 21-22.
The New York courts have given the phrase "dangerous instrument" a broad reading consistent with the obvious legislative intent. In People v. Carter, 53 N.Y.2d 113, 440 N.Y.S.2d 607, 423 N.E.2d 30 (1981), the defendant quarrelled with his girlfriend and, when she got out of his car and attempted to walk away, he viciously assaulted her by striking her several times with his fists. When she fell to the ground and lay helpless on the pavement, he kicked and stomped her several times in the head and face. As a result, she lapsed into a coma. At the time of trial several months later, she was comatose and expert testimony indicated that it was unlikely that she would ever recover and improve. The defendant was convicted of assault in the first degree and his conviction was affirmed on appeal. The court rejected his argument that a pair of "rubber boots," which he was wearing at the time of the assault, could not be considered a "dangerous instrument." It said:
The statute makes no attempt to give an absolute definition of the term [dangerous instrument] or to provide a list of items which can be considered dangerous instruments. Instead the statute states plainly that any "instrument, article or substance" no matter how innocuous it may appear to be when used for its legitimate purpose, becomes a dangerous instrument when it is used in a manner which renders it readily capable of causing serious physical injury. (See Hechtman, Practice Commentaries, McKinney's Cons.Laws of N.Y., Book 39, Penal Law, § 10.00, p. 21.) The object itself need not be inherently dangerous. It is the temporary use rather than the inherent vice of the object which brings it within the purview of the statute.
Id. at 31-32.
The court concluded:
Here, there is evidence that the defendant used the rubber boots to stomp upon the head and face of his victim, causing her head to contact the pavement below with tremendous force. The jury apparently concluded that the pair of boots, when used in this fashion, was readily capable of causing serious physical injury and, thus, was a "dangerous instrument" within the meaning of subdivision 13 of section 10 of the Penal Law. On this record, we cannot say that such a conclusion was erroneous as a matter of law.
Id. at 32.
In reaching its conclusion, the court noted that a number of other jurisdictions have held that ordinary shoes when used in a manner likely to cause serious injury are dangerous instruments. See Annot., 33 A.L.R.3d 922 (1970).
The cases which have held kicking to involve an assault with a dangerous instrument under statutes similar to ours include situations where an assailant has rendered his victim helpless by a blow or blows and, while he or she lays vulnerable on the ground, kicks or stomps upon them. These cases do not differentiate between similar assaults shod and unshod as the Ransom court required. Rather, they look to the manner of inflicting the injuries on the victim and determine from that examination whether or not the assault was within the statute. Every kick or blow, even if it causes serious injury, will not automatically be an assault with a dangerous instrument. Here, the defendant, intending to cause serious physical injury, disabled his victim and then proceeded to kick him repeatedly causing physical injury. In such cases, the trier of fact may properly find a first degree assault.
*1218 Wettanen argues that this construction of the statute renders its reference to "a dangerous instrument" superfluous. If the Legislature wished to enact an aggravated assault statute Wettanen contends it could easily have done so without mentioning "dangerous instrument." Wettanen reasons that the statute requires an intent to cause serious physical injury and resulting physical injury. He argues that since a person will naturally choose means satisfactory to attain his end, any case in which the state proves an intent to cause serious physical injury and resulting injury will satisfy our interpretation of the statute rendering it unnecessary for the trier of fact to identify the particular "dangerous instrument" in question and determine its characteristics. Wettanen overlooks the function the reference to "dangerous instrument" plays in the statute. In the new code, the elements of crimes are divided into: mens rea, results, and surrounding circumstances. Neitzel v. State, 655 P.2d 325 (Alaska App., 1982). AS 11.41.200(a)(1) requires intent to cause serious physical injury as the mens rea, and physical injury as the result. The requirement of a "dangerous instrument" serves to define the surrounding circumstances. Intent is normally inferred from those circumstances. Frequently, intent will be proved by evidence which would support a finding of serious physical injuries. Therefore, the requirement of a dangerous instrument serves to shift the focus of the trier of facts' attention from the result (physical injuries), which in any given case may have been unforseeable to the defendant at the time the assault was committed, to the manner in which the assault was committed. Thus, the defendant is protected against a finding of first degree assault in which the jury determines guilt solely by finding serious physical injury and then inferring an intent to cause that serious physical injury from the injuries alone.
Our conclusion that under certain circumstances a foot may be a "dangerous instrument" regardless of how it is shod does not require us to determine whether a bare fist can be a dangerous weapon under similar circumstances. We recognize that cases from other jurisdictions are hopelessly in conflict on that question. See Annot., 8 A.L.R. 4th 1268 (1981). We do hold, however, that while feet are not dangerous instruments per se, they may become so, however they are shod, if used in such a way as to be capable of causing death or serious physical injury. AS 11.81.900(b)(11).
Finally, we do not find a fatal variance between the indictment that charged Wettanen with kicking Harrison with "shod feet" and proof at trial that did not set out the characteristics of the footgear with which he was shod. As we have indicated, the significant factor is the manner of administering the kicks and the victim's vulnerability to those kicks and not the particular characteristics of the footgear in question.
The judgment of the superior court is AFFIRMED.