**Louis P. HART, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–295.

Court of Appeals of Alaska.

June 21, 1985.

---

Charles R. Pengilly, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

OPINION

SINGLETON, Judge.

Louis P. Hart pled *nolo contendere* and was convicted of assault in the first degree, AS 11.41.200, and attempted murder in the first degree, AS 11.41.100; AS 11.31.100(a). In accordance with an agreement with the state, Hart was adjudicated guilty but mentally ill, AS 12.47.030. He entered his plea in reliance on *Oveson v. Anchorage*, 574 P.2d 801 (Alaska 1978), and *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). He was sentenced to twelve years with five years suspended on each count, to be served concurrently.

Louis Hart shot Kathy Lynch. The bullet went through Lynch, striking Lynch's sixteen-month-old daughter, J. Lynn Knoblock. On May 10, 1983, the grand jury returned an indictment in three counts against Hart. Count I charged that on May 3, 1983, Hart unlawfully and recklessly caused serious physical injury to Kathy

653

Lynch by means of a dangerous instrument by shooting her with a handgun. Count II charged that on the same date and at the same time and place, Hart unlawfully and recklessly caused serious physical injury to J. Lynn Knoblock by means of a dangerous instrument by shooting her with a handgun. This charge was apparently based on a theory of transferred intent. Finally, Count III charged that at the same time and place, Hart unlawfully, with the intent to cause her death, attempted to kill Lynch by shooting her with a handgun. When Hart entered pleas of *nolo contendere* to Count II and Count III, Count I was dismissed, apparently on the ground that it was duplicative of Count III.

Hart argues four issues on appeal. First, he contends that holding someone criminally responsible who lacks "the capacity to conform his conduct to the requirements of the law" violates the constitutions of Alaska and the United States in that it violates due process, it constitutes cruel and unusual punishment, and it results in the deprivation of equal protection to those so sanctioned. Second, Hart argues that AS 11.41.200(a)(1), assault in the first degree, a class A felony, and AS 11.41.210(a)(2), assault in the second degree, a class B felony, prescribe different degrees

of punishment for the same act, committed under the same circumstances by persons in like situations in violation of the so-called *Pirkey/Olsen* rule. *See State v. Pirkey*, 203 Or. 697, 281 P.2d 698, 702–03 (1955) *(en banc)*; *Olsen v. Delmore*, 48 Wash.2d 545, 295 P.2d 324, 327 (1956) *(en banc )*. Third, Hart contends that the statutes upon which his convictions are based were enacted in violation of the Alaska Constitution. Essentially, he argues that these sections, which were adopted as part of a general revision of the criminal laws, are defective in that both houses of the legislature did not pass the same bill. Finally, Hart argues that concurrent sentences of twelve years with five years suspended, leaving the seven-year presumptive sentences to serve were excessive under the circumstances. We affirm, but remand for resentencing. We will deal with each of Hart's arguments in order.

I.

Hart's first challenge is to the constitutionality of a statutory scheme which he interprets as intended to hold people criminally responsible who, as a matter of fact, lack substantial capacity to conform their conduct to the requirements of the law.[1]

1. Essentially, Hart argues that he would have been found insane and therefore not criminally responsible under former law but is "sane" and criminally responsible under current law. In Hart's view the change in the law resulted in a violation of his constitutional rights. Former Alaska Statute 12.45.083(a) provided:

A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

It was based upon the A.L.I. Model Penal Code § 4.01 (Proposed Draft 1962). In 1982, AS 12.45.083(a) was repealed and in its place the legislature enacted AS 12.47.010, insanity excluding responsibility, which provides:

(a) In a prosecution for a crime, it is an affirmative defense that when the defendant engaged in the criminal conduct, the defendant was unable, as a result of a mental disease or defect, to appreciate the nature and quality of that conduct.

(b) The affirmative defense defined in (a) of this section may not be raised at trial

unless the defendant, within 10 days of entering a plea or such later time as the court may for good cause permit, files a written notice of intent to rely on the defense.

(c) Evidence of a mental disease or defect that is manifested only by repeated criminal or any other antisocial conduct is not sufficient to establish the affirmative defense under (a) of this section.

(d) The affirmative defense specified in (a) of this section is the affirmative defense of insanity. A defendant who successfully raises the affirmative defense of insanity shall be found not guilty by reason of insanity and the verdict shall so state.

The legislature also enacted AS 12.47.030, guilty but mentally ill, which provides:

(a) A defendant is guilty but mentally ill if, when the defendant engaged in the criminal conduct, the defendant lacked, as a result of mental disease or defect, the substantial capacity either to appreciate the wrongfulness of that conduct or to conform that conduct to the requirements of law. A defendant found guilty but mentally ill is not relieved of crimi-

In order to understand this challenge, it is necessary to briefly describe what Hart believes to be differences between the *M'Naghten* rule which governed the defense of insanity in Alaska prior to 1972; the A.L.I. "substantial capacity" test which operated in Alaska from 1972 until 1982, former AS 12.45.083(a); and the new statutory insanity defense, AS 12.47.010.

Before we proceed to a discussion of the three tests of criminal responsibility, however, it is necessary to point out one recurring problem in the analysis. All three tests purport to excuse from criminal responsibility a person who does not know the nature and quality of his acts. Unfortunately, this is one of the most ambiguous phrases in the history of the English common law.[2] In order to understand the ambiguity of this phrase as well as the very limited significance of our decision on this aspect of this case, it is necessary to review a bit of history.

In 1843 Daniel M'Naghten shot and killed Edward Drummond, private secretary to Robert Peel who was then the prime minister of England. M'Naghten was acquitted on grounds of insanity. This acquittal created some public clamor, culminating in a decision by the House of Lords at the time M'Naghten was acquitted to consider enacting legislation codifying the insanity defense. To aid in its deliberations, the House of Lords directed certain questions to the sitting trial judges asking them to comment on the existing rules governing the insanity defense. The *M'Naghten* case constitutes the answers the trial judges gave to those questions rather than the jury instructions given in M'Naghten's case. In fact the judges were careful to

caution that meaningful jury instructions could only be developed in the context of a particular case and that any attempt to define the rules must allow for modifications in future jury instructions to ensure proper jury understanding. *M'Naghten's Case*, [1843–1860] All E.R.Rep. 229, 233 (Tindal, C.J.).

Despite the peculiar context in which the *M'Naghten* rules transpired and the attempt to qualify their impact, the rules caught on and became established in the common law. Apparently no legislation was passed.

Almost immediately ambiguities in the rules were noticed. Two distinct views of the rules became established. One which could be termed the "psychiatric view" saw the rules presenting primarily fact questions. Proponents of this view, medical men and their allies in the legal profession, viewed the rules as attempting to describe only the most serious forms of mental derangement, those who in later years would be characterized by the medical profession as "psychotics." The medical authorities criticized the rules for holding responsible large numbers of persons who should not be held responsible, for limiting relevant evidence, and for asking juries to answer unintelligible questions. *See, e.g., Durham v. United States*, 214 F.2d 862 (D.C. Cir.1954); *Schade v. State*, 512 P.2d 907, 911–12 (Alaska 1973); *Pope v. State*, 478 P.2d 801, 807–12 (Alaska 1970) (Connor, J., concurring in part and dissenting in part); Platt & Diamond, *The Origins of the "Right and Wrong" Test of Criminal Responsibility and Its Subsequent Development in the United States; An Historical Survey*, 54 Calif.L.Rev. 1227 (1966); Note,

---

nal responsibility for criminal conduct and is subject to the provisions of AS 12.47.050.

 (b) Evidence of a mental disease or defect that is manifested only by repeated criminal or antisocial conduct is not sufficient to establish that the defendant was guilty but mentally ill under (a) of this section.

2. Knowing the nature and quality of an act can refer to the physical aspects of an act—for example, whether the defendant knows he is firing a gun—or it can refer to all aspects of an act

including its likely consequences to the actor and others. *See* Note, *Criminal Insanity*, UCLA–Alaska L.Rev., 8 Alaska L.J. 152, 152–53 (August 1970). The more recent English cases appear to use the phrase in the first sense and this is the interpretation suggested in the committee report accompanying the legislation which became the current law. *See* Supp. No. 63 at 5–6, in 3 House Journal (1982), following p. 2356. The latter interpretation was apparently adopted in *Chase v. State*, 369 P.2d 997 (Alaska 1962).

*Criminal Insanity*, UCLA–Alaska L.Rev., 8 Alaska L.J. 152, 153–54 (August 1970). In contrast, those who hold to the "legal view" of the *M'Naghten* rules argue that proponents of the psychiatric view have erected and demolished a straw man. Under this view, the rules do not restrict the admission of evidence or, if properly interpreted, lead to the conviction of those who are seriously ill. This view of the rules finds support in *Chase v. State*, 369 P.2d 997 (Alaska 1962), and J. Hall, *General Principles of Criminal Law*, 449–528 (2d ed. 1960). These various interpretations of the *M'Naghten* rules are contrasted and critiqued in 2 J. Stephen, *A History of the Criminal Law of England* 124–86 (1883); H. Fingarette, *The Meaning of Criminal Insanity* (1972), and A. Goldstein, *The Insanity Defense* (1967).

■ No decision of an Alaska appellate court has interpreted AS 12.47.010. Consequently, it is not possible at this point to say with assurance what its terms mean. *A fortiori*, it is impossible to say what evidence would be admissible or what jury instructions should be used to explain it to a jury. Generally, when the drafters of an enactment use language that has previously been judicially construed, they are presumed to use it in the sense previously placed upon it by the court. *Marina Pt., Ltd. v. Wolfson*, 30 Cal.3d 721, 180 Cal. Rptr. 496, 504, 640 P.2d 115, 123 (1982). The Alaska Supreme Court gave the phrase "know the nature and quality of his act" a truly broad reading in *Chase*, 369 P.2d at 1002–03. When the legislature enacted AS

12.47.010, it modified the language construed in *Chase* in two respects. It changed the word "know" to "appreciate," in apparent reliance on the A.L.I. Model Penal Code formulation, and it changed the word "act" to "conduct." *Cf.* AS 11.81.-900(b)(5) ("Conduct" means an act or omission and *"its accompanying mental state"* (emphasis supplied)).

However, in this case, neither party has expressly asked us to interpret the statute, and the parties' decision to forego trial made it unnecessary for the trial court to develop jury instructions or rule on evidence. Our resolution of the constitutional issues presented by the parties must be read with this in mind. We accept for purposes of this case only the interpretation of AS 12.47.010 upon which the parties' constitutional arguments depend.

It is also necessary to bear one further preliminary distinction in mind, *i.e.*, whatever insanity defense exists, it is different from and in addition to the use of psychiatric rebuttal evidence to show diminished capacity to negate the prosecution's proof that the defendant had the necessary *mens rea* to commit a particular offense, at least an offense requiring specific intent. *Mill v. State*, 585 P.2d 546 (Alaska 1978) (mental disease or defect can prevent formation of specific intent but not general intent).[3] Thus even if the Alaska legislature had purported to entirely repeal any insanity defense, it would still be necessary for the state to prove beyond reasonable doubt that the defendant engaged in conscious voluntary acts, AS 11.81.600,[4] and pos-

---

**3.** The Alaska Revised Criminal Code does not use the terms specific and general intent. Instead, it uses the terms intentionally, knowingly, recklessly, and with criminal negligence. *See* AS 11.81.900(a). The interplay between these terms and diminished capacity is more fully addressed in *Neitzel v. State*, 655 P.2d 325 (Alaska App.1982).

**4.** Alaska Statute 11.81.600, general requirements of culpability, provides in relevant part:

(a) The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which the person is capable of performing.

(b) A person is not guilty of an offense unless the person acts with a culpable mental state, except that no culpable mental state must be proved

(1) if the description of the offense does not specify a culpable mental state and the offense is

(A) a violation; or

(B) designated as one of "strict liability"; or

(2) if a legislative intent to dispense with the culpable mental state requirement is present.

Assault in the first degree and attempted murder are clearly not strict liability offenses or violations, nor is there any suggestion that the

sessed the requisite *mens rea* for the offense. AS 12.47.020.[5]

It is only in this context that the statutory amendments resulting in the enactment of AS 12.47.010, insanity excluding responsibility, and AS 12.47.030, guilty but mentally ill, can be understood. In short, AS 12.47.010 and AS 12.47.030 are consistent with traditional statutes purporting to describe insanity defenses in that they both involve something distinct from, and in addition to, a claim that by virtue of mental illness a person either acted unconsciously or involuntarily or was unable to formulate the necessary *mens rea* to be guilty of an offense. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). In *Leland* the Supreme Court held that Oregon could properly require a defendant, defending on the ground of insanity, to prove insanity beyond reasonable doubt as a prerequisite to an acquittal. The Court reasoned that the statute did not diminish the state's burden of proving both the *mens rea* and the *actus reus* of an offense beyond reasonable doubt.

In order to see how this operates in practice, it is now necessary to explore the differences which the parties perceive to exist between the various formulas describing the insanity defense. The earlier *M'Naghten* test[6] may be described as follows:

Taken literally, the M'Naghten rule appears to refer to a certain mental disability which must produce one of two conditions, both of which are defined in terms of lack of cognition. Thus the elements of M'Naghten might be distinguished in this way:

(1) (disability) that the accused have suffered a defect of reason, from a disease of the mind; *and*

(2) (result) that consequently at the time of his act he did not know

(a) the nature and quality of the act, *or*

(b) that the act was wrong.

---

legislature intended to dispense with culpable mental states when it enacted those statutes.

**5.** Alaska Statute 12.47.020, mental disease or defect negating culpable mental state, provides:

(a) Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a culpable mental state which is an element of the crime. However, evidence of mental disease or defect that tends to negate a culpable mental state is not admissible unless the defendant, within 10 days of entering a plea, or at such later time as the court may for good cause permit, files a written notice of intent to rely on that defense.

(b) When the trier of fact finds that all other elements of the crime have been proved but, as a result of mental disease or defect, there is a reasonable doubt as to the existence of a culpable mental state that is an element of the crime, it shall enter a verdict of not guilty by reason of insanity. A defendant acquitted under this subsection, and not found guilty of a lesser included offense, shall automatically be considered to have established the affirmative defense of insanity under AS 12.47.010. The defendant is then subject to the provisions of AS 12.47.090.

(c) If a verdict of not guilty by reason of insanity is reached under (b) of this section, the trier of fact shall also consider whether defendant is guilty of any lesser included offense. If the defendant is convicted of a lesser included offense, the defendant shall be sentenced for that offense and shall automatically be considered guilty but mentally ill under AS 12.47.030 and AS 12.47.050. Upon completion of a sentence for a lesser included offense, a hearing shall be held under AS 12.47.090(c) to determine the necessity of further commitment of the defendant, based on the acquittal for the greater charge under (b) of this section. If the defendant is committed under AS 12.47.090(c), the defendant is subject to the provisions of AS 12.47.090(d)–(j).

**6.** The relevant *M'Naghten* rule has been set out as follows:

"* * * to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." M'Naghten's Case, 8 Eng.Rep. 718, 722 (H.L. 1843) [[1843–60] All E.R.Rep. 227 (1843) ], *quoted in* Hall, Responsibility and Law: In Defense of the McNaghten Rules, 42 A.B.A.J. 917 (1956).

*Quoted in Chase v. State,* 369 P.2d at 998 n. 2 (Alaska 1962).

W. LaFave and A. Scott, *Criminal Law* § 37, at 275 (1972).

In many jurisdictions, the *M'Naghten* test was supplemented by the "irresistible impulse" test which LaFave and Scott describe as follows:

> Broadly stated, this rule requires a verdict of not guilty by reason of insanity if it is found that the defendant had a mental disease which kept him from controlling his conduct. Such a verdict is called for even if the defendant knew what he was doing and that it was wrong; the defendant's mental condition need not satisfy both the M'Naghten *and* "irresistible impulse" tests.

*Id.* at 283.

The *M'Naghten* test was adopted by the Alaska Supreme Court in *Chase,* 369 P.2d 997 (Alaska 1962), which specifically rejected the irresistible impulse extension and the *Durham* rule.[7] *Chase,* 369 P.2d at 999–1001. Prior to the statutory changes challenged by Hart, however, Alaska abandoned *M'Naghten* and adopted, both by case law and statute, the so-called A.L.I. "substantial capacity" test. *See Schade v. State,* 512 P.2d 907 (Alaska 1973); former AS 12.45.083. LaFave and Scott describe the A.L.I. test as a "modernized version of the M'Naghten and the irresistible impulse tests."

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.
>
> (2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

W. LaFave and A. Scott, *supra,* at 292 (footnotes omitted), *quoting* Model Penal Code § 4.01 (Proposed Official Draft 1962). LaFave and Scott compare the A.L.I. test and earlier tests as follows:

> As indicated in the accompanying commentary, the Code draftsman rejected the Durham rule because of the ambiguity of the word "product". M'Naghten and irresistible impulse, however, were not totally rejected; these two tests, combined, were seen as properly focusing upon impairment of cognition and impairment of volitional capacity— conditions which must be taken into account in an effort to exclude nondeterrables from penal sanctions. The result, therefore, was a broader statement of the concepts basic to the M'Naghten and irresistible impulse tests.

*Id.* at 293 (footnotes omitted). If we view the A.L.I. test as essentially a restatement of the two components of the *M'Naghten* test, combined with the irresistible impulse test, it is possible to compare the A.L.I. test to the new statutes. The new category of guilty but mentally ill includes everyone who previously would have been relieved from criminal responsibility by virtue of the A.L.I. test. AS 12.47.030. However, a subset of that group may escape criminal responsibility entirely in reliance on AS 12.47.010. This group is comprised of those who were unable, as a result of mental disease or defect, to appreciate the nature and quality of their conduct. This appears to be the group that would have escaped criminal responsibility under Alaska law as it existed prior to 1972. *Chase v. State,* 369 P.2d at 998–1003.[8]

---

**7.** *See Durham v. United States,* 214 F.2d 862 (D.C.Cir.1954). The *Durham* rule absolved from criminal responsibility anyone whose otherwise criminal act was the product of mental disease or defect. It was rejected in *Chase,* 369 P.2d at 999.

**8.** The court in *Chase* adopted the *M'Naghten* test but held that its two prongs were essentially different ways of saying the same thing. Thus, the court seemed to reason, a person who does not appreciate the nature and quality of his conduct would not appreciate its wrongfulness and, perhaps more significantly, the converse would be true as well—one who did not appreciate the wrongfulness of his conduct could not be said to truly appreciate the nature and quality of his act. *See also Pope v. State,* 478 P.2d 801, 809 (Alaska 1970) (Connor, J., concurring in part and dissenting in part).

In summary, if we assume that three distinct classes of individuals are exempted from criminal responsibility under the A.L.I. test—first, those who were unable as a result of mental disease or defect to appreciate the nature and quality of their conduct; second, those who by virtue of mental disease or defect were unable to appreciate that their acts were wrong; and third, those who knew what they were doing and knew that it was wrong, but nevertheless were irresistibly impelled to perform the act—only the first is now expressly exempt from criminal responsibility under Alaska law. The latter two categories are guilty but mentally ill.[9]

Theoretically, anyone who falls into either of the two classes exempt under A.L.I., but responsible under current law, could contend that his or her inclusion within the category of "guilty" violated his or her constitutional rights. Practically, however, on this record Hart may not make that argument. Hart's case was terminated without trial by virtue of a *Cooksey* plea. We thus do not have the benefit of any extended evidentiary record regarding Hart's mental condition. Rather, we must rely on the equivalent of a stipulated set of facts since Hart elected to present his defense to the trial court pretrial in the form of an offer of proof based upon a psychiatric report from Dr. Irvin A. Rothrock, a Fairbanks psychiatrist. Dr. Rothrock's report indicates that Hart possessed the necessary *mens rea* to be convicted of the crimes in question and further that he met the so-called *M'Naghten* test of criminal responsibility. In Dr. Rothrock's view, however, Hart could rely on that part of the A.L.I. test derived from the irresistible impulse test. Dr. Rothrock's report concludes as follows:

1. I believe Mr. Hart has the capacity to understand the nature of the charges against him and to cooperate with his attorney in the preparation of a defense.

2. At the time of the alleged offense I believe he had the ability to understand the nature and quality of his act and to form a culpable state of mind, specifically the intent to fire a pistol at Ms. Lynch.
3. At the time of the alleged offense, I believe the defendant had the capacity to appreciate the wrongfulness of his act, but because of his mental disease I doubt that he had the capacity to conform his conduct to the requirements of the law.

At sentencing Dr. Rothrock expanded upon his report. Essentially, he testified that because of mental disease, Hart believed that Kathy Lynch could read his mind and thus regularly invaded his privacy. In essence, Dr. Rothrock reported Hart shot Lynch in outrage over this perceived invasion of privacy. If we assume that Lynch could in fact read Hart's mind or that he reasonably believed that she could, then his defense would essentially have been extreme provocation. If we assume that Dr. Rothrock's findings establish the factual basis for the plea regarding the *mens rea* elements of the offense and informed defendant of defense counsel's understanding of the circumstances of the *Cooksey* plea, then it appears that the parties entered into a stipulation that Hart met the so-called cognitive prong of the A.L.I. test and failed only the so-called volitional prong of the test. If this is so, then the state would appear correct in analyzing Hart's contention to be that any statutory scheme that does not allow irresistible impulse as an exemption from criminal responsibility is, by virtue of that fact alone, unconstitutional. *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), specifically rejects this claim; therefore, Hart has no claim under federal constitutional law. *See also Chase,* 369 P.2d at 1001 (the present state of development of the science of psychiatry does not provide a basis of knowledge which persuades the court that it is necessary or even advisable to apply the irresistible impulse theory

---

**9.** The difficult question of whether the legislature truly perceived such distinct classes to exist

is a matter which must await further litigation.

to the determination of criminal insanity under Alaska law).

 We see no reason to interpret Alaska constitutional law differently. The holding in *Leland* is predicated in part on a recognition that concepts like mental illness, insanity, and criminal responsibility are legal and ethical terms, not medical terms. Our law is therefore predicated on the assumption that men and women are moral agents who have the power to choose between good and evil and, generally, are properly held accountable for their acts. The determination of the point at which a person's mental condition justifies exculpation is therefore an ethical question for legislators and juries, not courts. *See Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (holding that conviction for public drunkenness of one who was to some degree compelled to drink did not amount to cruel and unusual punishment); *accord Evans v. State*, 645 P.2d 155, 158–60 (Alaska 1982); *Vick v. State*, 453 P.2d

342, 344–45 (Alaska 1969). The Alaska Supreme Court considered and rejected the "irresistible impulse" test and the *Durham* test in *Chase* in part for these reasons. *Chase*, 369 P.2d at 998–1001. We therefore conclude that the state may constitutionally eliminate a separate insanity defense based on "irresistible impulse" [10] or inability to conform one's conduct to the requirements of the law. *See also United States v. Lyons*, 731 F.2d 243 (5th Cir. 1984), *criticized in* Note, *United States v. Lyons: Abolishing the Volitional Prong of the Insanity Defense*, 60 Notre Dame L.Rev. 177 (1984).

## II.

 Hart next argues that AS 11.41.-200(a)(1), describing a class A felony, and AS 11.41.210(a)(2), describing a class B felony, prohibit essentially the same acts, circumstances, and results but adopt disparate penalties and, thus, violate the so-called *Pirkey/Olsen* rule. *See State v. Pirkey*, 203 Or. 697, 281 P.2d 698, 702–03 (1955) (*en*

---

10. Hart does not perceive his argument as requiring legislative recognition of a defense of irresistible impulse. On appeal, he seems to have that issue confused with the contention that he was somehow precluded from offering evidence of mental impairment to defeat a finding of the required *mens rea*. All of the cases he cites in this context stand for the proposition that it is unconstitutional to make certain offenses strict liability offenses, *see, e.g., Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288, 293 (1952); *Speidel v. State*, 460 P.2d 77, 78 (Alaska 1969), or to deprive a defendant of the opportunity to contest the *mens rea* of the offense for which he was convicted, *see, e.g., Hentzner v. State*, 613 P.2d 821, 825–29 (Alaska 1980); *Kimoktoak v. State*, 584 P.2d 25, 29 (Alaska 1978); *Wheeler v. State*, 659 P.2d 1241, 1251 (Alaska App.1983). As we have seen, however, Alaska statutes specifically permit use of evidence of mental illness where appropriate to challenge the *mens rea* of an offense, AS 12.47.020, and, given Dr. Rothrock's report, Hart's continued reference to his offense as being "inadvertent" is problematical. A person laboring under a so-called irresistible impulse is not engaging in inadvertent behavior. The behavior is advertent but arguably unavoidable. We stress, therefore, that our holding is limited to rejecting Hart's hypothetical contention that the legislature cannot constitutionally punish those who possess the ability to appreciate the nature and quality of their conduct and its wrongfulness but are "unable to conform

their conduct to the requirements of the law," and should not be read as interpreting the statute to have that effect; *a fortiori*, our holding does not limit the defendant's right to offer psychiatric or psychological rebuttal evidence to disprove *mens rea*. *See* AS 12.47.020.

As long ago as 1883, Sir James Fitzjames Stephen concluded that the *M'Naghten* Rule subsumed the irresistible impulse test in the sense that someone truly acting under such compulsion could not be found to know the nature and quality of his act as those phrases were properly interpreted. *See* 2 Stephen, *A History of the Criminal Law of England* 124–86, especially 167–68 (1883). Similar reasoning apparently influenced the *Chase* court to refuse to adopt irresistible impulse as a separate component of the insanity test. *Chase*, 369 P.2d at 1000. It is possible that AS 12.47.010 will eventually be interpreted as re-establishing *Chase* as the law of Alaska. We express no opinion on this point.

Finally, in the trial court Hart adopted by reference a number of briefs filed by other defendants challenging on broader constitutional grounds Alaska's new guilty but mentally ill statutory scheme. *See, e.g.,* Note, *Guilty But Mentally Ill: Broadening the Scope of Criminal Responsibility*, 44 Ohio St.L.J. 797 (1983); Comment, *The Insanity Defense: A Review of Recent Statutory Changes*, 3 J. of Legal Med. 617 (1982). We express no opinion about these other arguments which were not preserved in this court and do not appear relevant to Hart's specific situation.

*banc*) (holding that a defendant is denied equal protection if he is convicted of a crime with a greater penalty which has exactly the same elements as another crime with a lesser penalty); *Olsen v. Delmore,* 48 Wash.2d 545, 295 P.2d 324, 327 (1956). Alaska has never squarely adopted the *Pirkey/Olsen* rule, *see Bell v. State,* 598 P.2d 908, 912 (Alaska 1979), though it is mentioned in *Bell, State v. Erickson,* 574 P.2d 1, 18 n. 112 (Alaska 1978); *Holton v. State,* 602 P.2d 1228, 1237 (Alaska 1979), and *Keith v. State,* 612 P.2d 977, 986–89 (Alaska 1980). *See also Hemphill v. State,* 673 P.2d 888 (Alaska App.1983). Nevertheless, Hart argues, in an appropriate case the supreme court will adopt the rule and this, in Hart's view, is an appropriate case.

Hart was convicted of violating AS 11.-41.200(a)(1) which provides in relevant part:

> (a) A person commits the crime of assault in the first degree if
>
> (1) that person recklessly causes serious physical injury to another by means of a dangerous instrument.

AS 11.41.200(a)(1) is a class A felony. The maximum penalty is twenty years imprisonment. AS 12.55.125(c). Hart views this statute as identical to AS 11.41.210(a)(2) which provides:

> (a) A person commits the crime of assault in the second degree if
>
> . . . . .
>
> (2) that person recklessly causes serious physical injury to another person.

AS 11.41.210(a)(2) is a class B felony. The maximum penalty is ten years' imprisonment. AS 12.55.125(d).

Hart argues that in *Wettanen v. State,* 656 P.2d 1213 (Alaska App.1983), we held that anything that is used in a manner likely to cause death or serious physical injury is a dangerous instrument. From this, Hart reasons that it would be impossible to cause serious physical injury without using a dangerous instrument and that therefore the two statutes describe essentially the same conduct.[11]

---

**11.** In *Wettanen* we rejected this contention, reasoning:

> Wettanen argues that this construction of the statute [defining dangerous instrument to mean anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or physical injury] renders its reference to "a dangerous instrument" superfluous. If the Legislature wished to enact an aggravated assault statute Wettanen contends it could easily have done so without mentioning "dangerous instrument." Wettanen reasons that the statute requires an intent to cause serious physical injury and resulting physical injury. He argues that since a person will naturally choose means satisfactory to attain his end, any case in which the state proves an intent to cause serious physical injury and resulting injury will satisfy our interpretation of the statute rendering it unnecessary for the trier of fact to identify the particular "dangerous instrument" in question and determine its characteristics. Wettanen overlooks the function the reference to "dangerous instrument" plays in the statute. In the new code, the elements of crimes are divided into: *mens rea,* results, and surrounding circumstances. [Citation omitted.] AS 11.41.200(a)(1) requires intent to cause serious physical injury as the *mens rea,* and physical injury as the result. The requirement of a "dangerous instrument" serves to define the

surrounding circumstances. Intent is normally inferred from those circumstances. Frequently, intent will be proved by evidence which would support a finding of serious physical injuries. Therefore, the requirement of a dangerous instrument serves to shift the focus of the trier of facts' [sic] attention from the result (physical injuries), which in any given case may have been unforseeable [sic] to the defendant at the time the assault was committed, to the manner in which the assault was committed. Thus, the defendant is protected against a finding of first degree assault in which the jury determines guilt solely by finding serious physical injury and then inferring an intent to cause that serious physical injury from the injuries alone.

656 P.2d at 1218. *Accord Mill v. State,* 585 P.2d 546, 548–49 (Alaska 1978) (considering prior law). A majority of this court, consisting of Judge Coats and the author of this opinion, believes that what we said in *Wettanen* regarding intentional crimes applies equally to reckless crimes since the manner in which injuries are inflicted will serve to support an inference regarding the defendant's appreciation of the risks attending his conduct. Chief Judge Bryner disagrees. He would hold that, as to crimes having a *mens rea* of recklessness, reference to a dangerous instrument is superfluous and therefore AS 11.41.200(a)(1) and AS 11.41.-210(a)(2) are virtually indistinguishable. He would therefore find a violation of the *Pir-*

In *Erickson, Bell, Holton, Keith* and *Hemphill,* the courts discussed the *Pirkey/Olsen* rule and then pointed out that it was not violated because the allegedly duplicative statutes were distinct as to at least one element. In *Bell,* the supreme court recognized that the United States Supreme Court had never squarely addressed the *Pirkey/Olsen* issue, but that *certiorari* had been granted in a case called *United States v. Batchelder,* and a decision was pending in the United States Supreme Court. *Bell,* 598 P.2d at 912 n. 13. Eventually, the United States Supreme Court, in a unanimous opinion, rejected the underlying reasoning of *Pirkey/Olsen* but did not address the state cases specifically. *See United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). Justice Marshall reasoned that the Court had in the past approved a rule that where one act violates more than one criminal statute, the government may prosecute under either so long as it does not discriminate against any particular class of defendants. 442 U.S. at 123–24, 99 S.Ct. at 2204, 60 L.Ed.2d at 764–65. He then said:

> The Court of Appeals acknowledged this "settled rule" allowing prosecutorial choice. Nevertheless, relying on the dissenting opinion in *Berra v. United States,* 351 U.S. 131, 76 S.Ct. 685, 100 L.Ed. 1013 (1956), the court distinguished overlapping statutes with identical standards of proof from provisions that vary in some particular. In the court's view, when two statutes prohibit "exactly the same conduct," the prosecutor's "selection of which of two penalties to apply" would be "unfettered." Because such prosecutorial discretion could produce "unequal justice," the court expressed doubt that this form of legislative redundancy was constitutional. We find this analysis factually and legally unsound.

*Id.* (footnote and citations omitted).

The *Batchelder* Court held that allowing two statutes describing identical elements with disparate penalties to stand did not

leave prosecutorial discretion "unfettered" since it was necessarily subject to constitutional constraints. The Court emphasized that "the Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification." 442 U.S. at 125 n. 9, 99 S.Ct. at 2205 n. 9, 60 L.Ed.2d at 765 n. 9. In the Court's view, this restriction sufficiently "fettered" prosecutorial discretion to avoid an equal protection challenge. The Court concluded:

> More importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced.

*Id.* at 125, 99 S.Ct. at 2205, 60 L.Ed. at 765–66 (citations omitted). The Court went on to find that there was no unlawful delegation of legislative authority to prosecutors simply because two statutes had been enacted with overlapping terms.

While *Batchelder* may be distinguishable from the typical *Pirkey/Olsen* fact situation, the broad language of *Batchelder* would seem to dispose of the entire issue under federal law. *See, e.g.,* 2 W. LaFave and J. Israel, *Criminal Procedure* § 13.7, at 225–29 (1984); Comment, *Duplicative*

---

*key/Olsen* rule in this case. For reasons set out in the text, however, Chief Judge Bryner is of the view that Alaska should follow *Batchelder*

and reject the *Pirkey/Olsen* rule and he therefore joins in the decision to affirm Hart's conviction.

*Statutes, Prosecutorial Discretion, and the Illinois Armed Violence Statute,* 71 J. of Crim. Law and Criminology 226 (1980). The states have given a mixed reaction to *Batchelder.* The Supreme Court of Oregon viewed *Batchelder* as overruling *Pirkey* and refused to reach a result inconsistent with *Batchelder* under the Oregon Constitution. *See City of Klamath Falls v. Winters,* 289 Or. 757, 619 P.2d 217, 228–31 (1980). Nevada has also reconsidered its former adoption of *Pirkey/Olsen* in light of *Batchelder* and overruled *Spillers v. State,* 84 Nev. 23, 436 P.2d 18 (1968), and *Stanfill v. State,* 660 P.2d 1003 (Nev.1983). *See Sheriff, Clark County v. Killman,* 691 P.2d 434 (Nev.1984). The *Killman* court reads *Batchelder* as holding:

> A defendant will therefore only be able to demonstrate that a violation of his equal protection rights has occurred when he can show that he was singled out for prosecution on the more serious offense for a reason which is offensive to the Constitution.

691 P.2d at 436.[12]

The Washington Supreme Court seems to view *Batchelder* as inconsistent with *Olsen* and has reserved decision on whether a different reading should be given to the Washington Constitution. *See State v. Sherman,* 98 Wash.2d 53, 653 P.2d 612, 617 n. 6 (1982). It should be noted that the Washington courts have interpreted *Olsen* as applying only to the situation where identical conduct committed under identical circumstances would permit conviction of both a felony and a misdemeanor. Where the same conduct and circumstances could result in conviction of two felonies, one having a more serious penalty than the other, *Olsen* is not violated. *See State v. Edwards,* 17 Wash.App. 355, 563 P.2d 212,

216 (1977). Hawaii apparently interprets *Pirkey/Olsen* in the same way. *See State v. Modica,* 58 Haw. 249, 567 P.2d 420 (1977); *State v. Kuuku,* 61 Haw. 79, 595 P.2d 291, 293 (1979).

A majority of the courts considering the issue since *Batchelder* apparently follow the United States Supreme Court's decision. *See, e.g., State v. Weiner,* 126 Ariz. 454, 616 P.2d 914 (Ariz.App.1980); *People v. Ford,* 417 Mich. 66, 331 N.W.2d 878, 891–93 (1982); *State v. Secrest,* 331 N.W.2d 580 (S.D.1983).

In contrast, the Supreme Court of Colorado rejects *Batchelder* and apparently gives *Pirkey/Olsen* its broadest interpretation by applying it in cases involving two felony statutes with disparate penalties, as well as cases involving a felony statute and a misdemeanor statute. *See, e.g., People v. Marcy,* 628 P.2d 69, 73–75 (Colo.1981) (reaffirming a pre-*Batchelder* decision, *People v. Calvaresi,* 188 Colo. 277, 534 P.2d 316, 318 (1975)).

We have carefully considered the issue and all of the Alaska Supreme Court decisions discussing it and conclude that we should follow *Batchelder* and reject *Pirkey/Olsen,* at least to the extent that a defendant challenges two felony statutes contending that they overlap and provide disparate penalties. We reserve decision on the question of a felony statute and misdemeanor statute prescribing exactly the same conduct under the same circumstances. A number of factors influence our judgment. First, like the United States Supreme Court, we are satisfied that the court's power to prevent arbitrary enforcement against persons who, due to their particular lifestyles or other factors, incur the ire of those in a position to determine

---

**12.** The Alaska Supreme Court has recognized three potential problems with an unconstitutionally vague statute (1) that the existence of the statute will chill the exercise of first amendment rights (overbreadth), (2) that the reach of the statute is unclear so that prudent men and women must speculate whether or not it covers their intended conduct, and (3) that prosecutors may unfairly discriminate in deciding whether to enforce the statute against borderline con-

duct. The third problem is relevant here—the potential for discriminatory enforcement. The court has held, however, that it will not consider this issue in the absence of evidence that the statute has in fact been discriminatorily enforced. *State v. Rice,* 626 P.2d 104, 109 (Alaska 1981). The *Rice* rule is thus similar to the *Batchelder* rule and supports the decision which we reach in this case.

who shall be prosecuted adequately fetters prosecutorial discretion. *Compare State v. Rice*, 626 P.2d 104, 109 (Alaska 1981) (requiring a preliminary showing that prosecutorial discretion had been abused prior to holding a statute unconstitutionally vague), *with Keith v. State*, 612 P.2d 977, 986 n. 31 (Alaska 1980) (identifying prevention of discriminatory prosecution as primary reason for invalidating overlapping statutes). Second, we are concerned that the rule as adopted in *Marcy* and in cases like this one attacks statutes that are not overlapping on their face but only as interpreted. Statutes like those in our revised code which are based on the Model Penal Code and which separate almost every offense into degrees are particularly vulnerable to a finding of overlapping elements.

We therefore reject Hart's contention that the Alaska or federal constitutions preclude his conviction of a class A felony if the same conduct under the same circumstances could have resulted in his conviction of a class B felony.

### III.

Hart next argues that AS 12.47.010 was adopted in a bill that was not passed by both houses of the legislature. The same arguments were considered and rejected in *Galbraith v. State*, 693 P.2d 880 (Alaska App.1985).

### IV.

Finally, Hart contends that the two concurrent sentences of twelve years with five years suspended are excessive. Hart was convicted of assault in the first degree and attempted first-degree murder which are class A felonies, AS 11.41.200(b); AS 11.-41.100; AS 11.31.100(a). For each offense Hart was subject to a maximum term of twenty years' imprisonment. AS 12.55.-125(c). He was subject to a seven-year presumptive term for use of a firearm in committing a class A felony. AS 12.55.-125(c)(2). Superior Court Judge Jay Hodges found one aggravating factor, that Hart's conduct constituted the most serious offense within the definition of both of-fenses, AS 12.55.155(c)(10). He imposed the presumptive sentence of seven years and also imposed but suspended an additional five years. The sentence is therefore unremarkable unless Hart established a mitigating factor. Hart relied on AS 12.55.155(d)(3) which provides for a mitigating factor when an offense is committed "under some degree of duress, coercion, threat, or compulsion insufficient to constitute a complete defense, but which significantly affected the defendant's conduct." There was no testimony, except Dr. Rothrock's, related to this factor. The trial court rejected this mitigating factor out of hand but gave no reasons. Consequently, it is not clear whether Judge Hodges found that Dr. Rothrock's report and testimony were insufficient to establish the mitigator by clear and convincing evidence or whether Judge Hodges accepted the state's contention that only external factors could supply the requisite duress or compulsion. The state seems to concede that we must assume the latter and that such a finding conflicts with our decision in *Bell v. State*, 658 P.2d 787, 791 (Alaska App.1983). The state argues that we should overrule that decision. *But cf. Lee v. State*, 673 P.2d 892, 896 (Alaska App.1983); *Langton v. State*, 662 P.2d 954, 960 (Alaska App.1983).

We decline to overrule *Bell*. We are satisfied that a trial court, in imposing a presumptive sentence, may consider the interplay between the defendant's mental state and any mental illness he may have in determining whether the defendant has proved by clear and convincing evidence the requirements of AS 12.55.155(d)(3). The state's primary countervailing argument is that our construction of the mitigating factor causes substantial overlap and a certain inconsistency with some of the other mitigating factors. In *Juneby v. State*, 641 P.2d 823 (Alaska App.1982), *modified on other grounds*, 665 P.2d 30 (Alaska App.1983), we recognized that there is substantial overlap between the various aggravating factors and between the various mitigating factors. In our view, however, overlap, standing alone,

does not justify depriving Hart of the benefit of the mitigating factor if he can establish it on the record.

■ Our decision should not be read as holding that any offense caused in part by mental illness, however defined, is mitigated. Such a construction of AS 12.55.-155(d)(3) might conflict with the legislature's attempts to definitively deal with the interplay between mental illness and crime in AS 12.47.010, *et seq.; see also Lee v. State,* 673 P.2d at 896 (AS 12.55.155(d)(3) does not encompass behavior that is merely impulsive or the result of situational stress). We hold only that the trial court should not have rejected the mitigator out of hand without giving reasons. On remand the trial court should permit the parties to brief and argue the issue and it may permit additional evidence. The court should then disclose on the record its reasons for accepting or rejecting the mitigator.

The judgment of the superior court is AFFIRMED. The sentence of the superior court is VACATED and this case is REMANDED for resentencing.