**Gareth ALLEN, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–1313.**

Court of Appeals of Alaska.

July 29, 1988.

5. *City of Fairbanks v. Alaska Public Utilities* *Commission,* 611 P.2d 493, 495 (Alaska 1980).

Carol Greenberg, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Gareth Allen was convicted, following a jury trial, of two counts of terroristic threatening, in violation of AS 11.56.810. The offense is a class C felony. Superior Court Judge Beverly W. Cutler sentenced Allen to concurrent terms of four years with one year suspended. Allen appeals, alleging that the trial court erred in refusing to dismiss the charges on overbreadth and equal protection grounds, in admitting evidence of prior misconduct, in instructing the jury on the elements of the offense, and in denying his motion for a judgment of acquittal. Allen also contends that his sentence is excessive. We affirm the conviction but remand for resentencing.

In October of 1984, M.Q.'s fourteen-year-old daughter, D.Q., was reported as missing from Charter North Hospital in Anchorage, where she had been receiving treatment for a multiple personality disorder. When she left Charter North, D.Q. was in the company of another patient, D.H., a twenty-five year old woman who had been receiving treatment for a similar disorder. In the months that followed D.Q.'s disappearance, M.Q. made extensive but unsuccessful efforts to locate her daughter.

M.Q. resided in Palmer. In March of 1985, articles appearing in a local newspaper and in the Anchorage Times described D.Q.'s disappearance and detailed M.Q.'s efforts to find her daughter. On April 1, 1985, M.Q. received a call at home from a man who asked to speak with D.Q. The man refused to identify himself but claimed to be a good friend of D.Q. He said he had seen D.Q. in Wasilla two weeks earlier, that she was with D.H., and that the two were with a "rough crowd" that was involved in drugs and "photography." M.Q. took the reference to "photography" to mean pornographic photographs. According to the caller, D.Q. was "pretty drugged up" and "real glassy-eyed." The caller claimed that the people D.Q. was with had "plans" for her.

The caller offered to take M.Q. to D.Q. if M.Q. arranged to come alone. He asked M.Q. numerous personal questions, ostensibly so that he could recognize her when he met her to take her to see D.Q.

M.Q. was extremely frightened as a result of the call. That night, she had a nightmare in which her drugged daughter was starring in a pornographic film. M.Q. became concerned for her own safety and purchased a gun. M.Q. also reported the call to the Alaska State Troopers.

The caller made a second call to M.Q. on April 15. M.Q. was not at home, so the caller left a message on her telephone recorder. He said that he had located D.Q. and would be in touch with M.Q. again. M.Q. again notified the troopers, who were able to trace the call to Gareth Allen's residence in Wasilla.

M.Q. received a third call from the same man the following evening. The caller assured M.Q. that he would take her to see D.Q., but he said that he needed to make sure that M.Q. had not talked to anyone and that she would follow his future instructions. In response to questioning by M.Q., the caller identified himself only as "Jeff." The man said that he had located D.Q. since the last time he had spoken with M.Q.; he told M.Q. that D.Q. was on drugs and that one of the people D.Q. was with was involved in photography. The caller refused to tell M.Q. where D.Q. was, saying that he would rather take M.Q. herself, for her own safety. He then offered to take M.Q. to D.Q., but said that he would need two or three weeks before taking M.Q., since he had to assure that the people who were with D.Q. would not become suspicious. The caller claimed to be interested only in helping M.Q. and said that he was proceeding cautiously out of fear for his own safety. He told M.Q. that he would recontact her when it was safe to see D.Q.

This third call was also traced to Allen's residence. Allen was contacted and interviewed by the Alaska State Troopers on April 17. He at first adamantly denied

meeting D.Q. or calling M.Q. He thereafter made a number of conflicting statements, ultimately admitting that he had called M.Q. Allen said that, after reading the newspaper articles about D.Q. and M.Q., he thought he saw D.Q. in front of Huppie's Roadhouse, a bar in Wasilla. He assumed D.Q. was on drugs because of the bar's reputation for being frequented by a rough crowd of drug dealers. Allen admitted making up the information concerning D.Q.'s involvement in photography, saying he wanted to convince M.Q. that he actually knew the people who were with D.Q. Allen also acknowledged that he did not know D.Q.'s whereabouts but said he hoped to see her again soon. He claimed that he had called M.Q. only to raise her hopes of finding D.Q.

As a result of his two conversations with M.Q., Allen was arrested and charged with two counts of terroristic threatening. Prior to trial, he moved to dismiss his indictment on two grounds. First, Allen claimed that his right to equal protection was infringed because the crime of terroristic threatening, a felony, was legally indistinguishable from the crime of harassment, a misdemeanor. Second, Allen challenged Alaska's terroristic threatening statute as overbroad and violative of his first amendment right to freedom of speech. The superior court denied Allen's motions to dismiss.

Allen also sought a pretrial order barring the prosecution from introducing evidence at trial concerning a 1975 California conviction for battery. The trial court denied Allen's motion, finding the evidence to be relevant on issues other than Allen's propensity for similar misconduct.

At trial, Allen moved for a judgment of acquittal at the conclusion of the state's case-in-chief. His motion was denied. Allen also objected to the trial court's proposed instruction concerning the elements of terroristic threatening. The jury nevertheless convicted Allen of both counts of terroristic threatening. Following his sen-

tencing hearing, Allen appealed to this court.

■ On appeal, Allen contests the superior court's denial of his motions to dismiss. He first renews the equal protection claim that he asserted below, contending that he was subjected to arbitrary discrimination because the alleged misconduct in this case could have been prosecuted under the misdemeanor harassment statute as well as under the felony terroristic threatening statute.

Terroristic threatening is defined in AS 11.56.810(a)(1) as follows:

(a) A person commits the crime of terroristic threatening if the person knowingly makes a false report that a circumstance dangerous to human life exists or is about to exist and

(1) places a person in fear of physical injury to any person....

Under AS 11.61.120(a)(4), the misdemeanor of harassment is defined as follows:

(a) A person commits the crime of harassment if, with intent to harass or annoy another person, that person

. . . .

(4) makes an anonymous or obscene telephone call or a telephone call that threatens physical injury.

Allen's equal protection claim relies on the *Pirkey/Olsen*[1] doctrine, which holds that equal protection is violated when two criminal statutes prescribe different punishments for similarly situated persons committing the same act under the same circumstances. A comparison of the elements of terroristic threatening and harassment, however, reveals significant differences in their respective elements. In particular, the felony offense requires a false report of circumstances dangerous to human life, and the report must actually be shown to have placed some person in fear of physical injury. In contrast, harassment may be established by proving a threat of mere physical injury, and no resulting fear need be established.

---

1. *See State v. Pirkey*, 203 Or. 697, 281 P.2d 698 (1955), and *Olsen v. Delmore*, 48 Wash.2d 545, 295 P.2d 324 (Wash.1956).

Because of these differences, a violation of the misdemeanor harassment statute would not "invariably and necessarily constitute a violation of the felony provision." *Bell v. State*, 598 P.2d 908, 912–13 (Alaska 1979) (quoting *State v. Modica*, 567 P.2d 420, 421–22 (Haw.1977)). The *Pirkey/Olsen* doctrine thus has no application to Allen's case. *Bell*, 598 P.2d at 912–13; *Hemphill v. State*, 673 P.2d 888, 889–90 (Alaska App.1983).[2]

■ Allen also renews the overbreadth challenge that he raised below. He contends that the terroristic threatening statute regulates speech in a way that subjects innocent persons to criminal sanctions and is therefore impermissibly broad. *See, e.g., Marks v. Anchorage*, 500 P.2d 644 (Alaska 1972). Allen posits that the statute could include within its reach reports that the defendant reasonably but mistakenly believes to be true, as well as innocuous practical jokes that result in actual but unreasonable fear of physical injury. Allen reasons that the Alaska Legislature could not have meant to make felonious either a mistaken but good faith attempt to warn others of danger or a practical joke that reasonably appeared to be innocuous when it was made.

Allen's overbreadth argument is predicated upon a misunderstanding of the culpable mental state requirement of the terroristic threatening statute. The argument wrongly assumes that, to prove guilt, the state need only establish that the defendant knowingly made a statement concerning a dangerous circumstance or condition, that the statement was in fact false, and that it placed the victim in fear.

Allen's interpretation is mistaken in two respects. First, the plain wording of the terroristic threatening statute requires proof that the defendant knowingly made a false report. The requirement of knowledge extends to the falsity of the report. The state must thus establish not only the falsity of the report but also the defendant's actual awareness of its falsity. Second, the statutory language hinges a conviction on proof that the defendant's conduct had a specified result: that it actually placed a person in fear of physical injury to any person. Under AS 11.81.600(b) and .610, when a criminal statute specifies a result as a necessary element of an offense without expressly providing for a culpable mental state to accompany the result, the applicable culpable mental state is recklessness. *See Neitzel v. State*, 655 P.2d 325, 328–29 & n. 1 (Alaska App.1982).[3] Thus, the state must at a minimum establish that the defendant acted recklessly with respect to placing another person in fear by making a report that the defendant knew to be false.

Interpreted in this manner, the terroristic threatening statute meets the concerns raised by Allen. The statute does not expose a person to criminal liability for making false reports that the person honestly but mistakenly believes to be true; nor does it create a risk of conviction stemming from unreasonable or unforeseeable fear on the part of the victim. We find that the statute does not constitute an impermissibly broad restriction of protected speech.

2. In *Hart v. State*, 702 P.2d 651, 662 (Alaska App.1985), we declined to follow the *Pirkey/Olsen* rule where two statutes punished the same conduct differently, but both offenses were classified as felonies. We reserved the issue of whether the doctrine might apply where two criminal statutes covered identical acts and where the acts would be punishable as a misdemeanor under one statute and as a felony under the other. The differences between the elements of harassment and terroristic threatening make it unnecessary for us to decide the issue reserved in *Hart.*

3. *But see Ortberg v. State*, 751 P.2d 1368, 1374 (Alaska App.1988), and *Bell v. State*, 668 P.2d

829, 833 (Alaska App.1983), where we held that a culpable mental state need not be imputed to a statutorily specified element unless the mental state would be necessary to assure that the defendant acted with a consciousness of guilt in committing the offense. In the present case a culpable mental state must be required with respect to the falsity of a report, because the terroristic threatening statute would otherwise permit the conviction of individuals based on their good faith belief that a report was true; guilt would be predicated on the actual truthfulness of the report without any need for a showing of consciousness of guilt.

*See Jones v. Anchorage,* 754 P.2d 275 (Alaska App.1988).

In a related point, Allen asserts that the trial court incorrectly instructed the jury on the elements of terroristic threatening. Specifically, he contends that the court neglected to tell the jury that the state was required to prove that Allen acted recklessly in placing M.Q. in fear that her daughter would by physically injured. Allen is mistaken. A review of the instructions establishes that the trial court correctly informed the jury of the necessary elements of the offense.

Allen next contends that the trial court erred in admitting evidence concerning a prior incident of similar misconduct. Alaska Rule of Evidence 404(b) provides:

> *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule precludes the admission of evidence of prior misconduct when its sole relevance is to establish the defendant's propensity for crime. *State v. Lerchenstein,* 726 P.2d 546, 549 (Alaska 1986). The rule does not bar the admission of evidence of other misconduct when it is relevant to establish that the defendant acted knowingly or to refute a claim of accident. *See Adkinson v. State,* 611 P.2d 528, 531 (Alaska 1980); *Demmert v. State,* 565 P.2d 155, 157 (Alaska 1977); *Rhodes v. State,* 717 P.2d 422, 424–25 (Alaska App.1986); *Sheakley v. State,* 644 P.2d 864, 874 (Alaska App.1982); *Davis v. State,* 635 P.2d 481, 485 (Alaska App.1981).

Here, Allen attempted to defend against the terroristic threatening charges by raising a "good samaritan" defense. He sought to establish that he honestly believed he had seen D.Q. in the Wasilla area and that he called M.Q. out of a genuine concern for her well being. By relying on the good samaritan defense, Allen affirmatively asserted that his motive in calling M.Q. was legitimate and that, if he was mistaken about D.Q.'s whereabouts, the mistake was made in good faith.

To rebut this line of defense, the state was allowed to show Allen's involvement in a similar incident. The state's evidence established that, while living in China Lake, California, in 1975, Allen read an article in a local newspaper reporting that China Lake residents Ronald Hinkle and his wife, Barbara Hinkle, were in Europe for several weeks and that D.N., a woman who also lived in China Lake, was house sitting for the Hinkles. Allen called D.N. at the Hinkle's residence. He gave a false name and asked for Barbara Hinkle. When D.N. told Allen that the Hinkles were away, he asked her if she wanted some company. D.N. said she did not, but offered to take a message for the Hinkles. Allen asked D.N. again if she wanted company. D.N. said no and hung up.

Several days later, Allen went to the Hinkle residence to meet D.N. personally. He claimed to be a friend of the Hinkles and asked if he could leave some drawings that he was doing for a backyard project the Hinkles were planning. As D.N. led Allen into the guest room, he grabbed her. D.N. managed to pull herself away from Allen. Allen ultimately apologized to D.N., saying that he grabbed her because he had a problem. He told D.N. that he had done similar things before.

As a result of this incident, Allen was charged with assault with intent to commit rape. The charge was later reduced, and Allen was convicted of misdemeanor battery. In ruling that the evidence of the battery conviction was admissible, the trial court noted substantial similarities between the prior conduct and Allen's current charge: in each case, Allen sought out a vulnerable female victim from a local newspaper article and established contact with her. He telephoned each victim, and, using false pretenses, he asked numerous questions to gain information that would enable him to be alone with her. In the case of D.N., he confronted his victim while she was alone. In M.Q.'s case, he attempted to

arrange a meeting but was arrested before one could actually occur.

The trial court reasoned that the similarity of the California incident made it directly relevant to show that Allen's real purpose in contacting M.Q. was not to assist her in finding D.Q. and that Allen's statements to M.Q. concerning D.Q.'s circumstances were a pretext that Allen knew to be false. The court carefully balanced the probative value of the evidence against its potential for prejudice and concluded that it should be admitted.

To reduce the possibility of prejudice, the court precluded any testimony suggesting that the California offense was an attempted sexual assault. The court also instructed the jury that the evidence was not being admitted to establish Allen's character or propensity for similar misconduct. The court also admonished the jury to consider that the prior incident was remote in time:

> You may not consider the evidence just to prove that [Allen is] a person disposed to commit crimes in general.... I also want to caution you that the incident [D.N. is] going to relate to you did take place—I believe the date was 1975. Certainly some time in the past, and you may want to consider that in deciding how much weight you wish to give it.

Considering the totality of the circumstances, we conclude that the trial court did not abuse its discretion in finding that the probative value of the challenged evidence outweighed its potential for prejudice. Allen affirmatively placed his intent in issue; the evidence relating to the California battery was highly probative to establish his knowledge that his statements concerning D.Q. were false, and that he either knew or reasonably should have known that M.Q. would be placed in fear by the false statements. Furthermore, the trial court took

all reasonable precautions to minimize the prejudicial impact of the evidence and to assure that it was not misapplied as proof of propensity. We find that the evidence was properly admitted.

■ Allen's last ground for challenging his conviction is the claim that the trial court erred in denying his motion for a judgment of acquittal. Allen contends that the evidence at trial was insufficient to establish the falsity of his statements concerning D.Q.

In considering claims of insufficient evidence, we must view the record in the light most favorable to the state and determine whether fair-minded jurors could differ on the question of whether the defendant's guilt was established beyond a reasonable doubt. *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976). Particularlay in light of Allen's own conflicting statements to the troopers and in light of the evidence dealing with Allen's 1975 conviction, there was ample evidence to permit reasonable jurors to conclude that Allen's statements concerning D.Q. were false and that he was aware of their falsity when he made them. The trial court did not err in denying Allen's motion for a judgment of acquittal.

■ Allen lastly challenges his sentences as excessive. The crime of terroristic threatening is a class C felony and is subject to a maximum term of five years' imprisonment. AS 11.56.810(b); AS 12.55.-125(e). The applicable presumptive terms are two years for a second felony offender and three years for a third or subsequent offender. AS 12.55.125(e).

At the time Allen committed the present offense, he was thirty-four years of age. His only prior conviction was the 1975 California conviction for misdemeanor battery.[4]

4. The state's sentencing memorandum points out several other instances of possible misconduct. It notes that Allen committed a shoplifting offense as a juvenile. No details are given in the record. The state also notes that Allen was involved in setting a house on fire and that he threw a puppy into a burning trash can. Both of these incidents, however, appear to have occurred when Allen was two years old. The final incident noted by the state involved a pos-

sible assault on a woman who was subsequently selected to serve as a member of Allen's jury. The possible assault was disclosed during Allen's trial, when the juror reported to the court that she had just realized that she recognized Allen as someone who had been in her store. She said that Allen had come up behind her while she was working on a store display and put his hands around her waist. She turned around, but Allen held his arms in place, saying

Allen had completed high school and attended a year of college. He had served in the military during the Vietnam war and received an honorable discharge. In the years following his discharge from the military, Allen appears to have become involved in various forms of substance abuse. In recent years, however, his substance abuse does not appear to have been a problem. Allen has a steady history of employment. At the time of the offense, he was married and was active in his church. He received numerous letters from individuals in the community attesting to his good character.

Allen steadfastly maintained his innocence throughout the proceedings below. Two psychological reports and a psychiatric evaluation were prepared for the court's use in connection with Allen's case. All described Allen as above average in intelligence and found no evidence of any major mental illness. All of the reports were in general agreement, however, that Allen appeared to suffer from a moderate or severe personality disorder involving impulsivity and impaired judgment. The reports noted that Allen had poor insight into his problems and exhibited a high degree of evasiveness and denial. There was also general agreement that Allen's prospects for rehabilitation through treatment were guarded and that he would need long-term, intensive psychiatric treatment to address his problems. Representative of this conclusion is the evaluation submitted by Dr. David J. Spernack, a clinical psychologist, which states, in relevant part:

> It is my opinion that Mr. Allen presents with a moderate-severe personality disorder, with narcissistic and antisocial features. The basis for this opinion is two-fold: Primarily, his inability to be straightforward in the presentation of the details of the present offense as well as his ability to provide a logical explanation for the emotional antecedents under-

lying his behavior, and secondly; his profound insensitivity to the effects of his behavior on other people. It is my opinion that his personality attributes periodically give way to a behavior disorder marked by impulsively poor judgment and inability to recognize the consequences of his actions. By virtue of his average-above average intelligence, it is my opinion that he has developed the ability to be cleverly evasive and resorts to pathological and impulsive lying to defend himself against accepting responsibility for his undesirable personality traits.

> . . . .

> By virtue of Mr. Allen's pathologically intense need to deny any emotional, personality, or behavioral problems, it is strongly recommended that he be required to pursue mental health counseling regardless of whether he is sent to prison or released to the community. The primary purpose of his mental health counselling would be to focus on helping Mr. Allen develop a more realistic assessment of himself, primarily through developing a self-evaluation mechanism and more emotional insight into his defensive, guarded style of interaction. I strongly recommend that the court require monthly progress reports from Mr. Allen and his therapist for the purpose of judging Mr. Allen's motivation and tolerance of said mental health counselling.

Despite this relatively poor prognosis, the conclusion voiced by the psychological and psychiatric reports was that Allen posed only a limited risk to public safety. Psychiatrist Dr. Deborah B. Geeseman found only "a small degree of risk of dangerousness." Dr. Geeseman explained:

> Based on the current interview and records provided for my review, I do not find any reference to his carrying out

something that led her to conclude that he had a sexual problem. The juror told the court that, having remembered this incident, she would be incapable of continuing to serve impartially. The court excused the juror, and her place was filled by an alternate.

Because the issue arose in the context of *voir dire,* the trial court did not inquire into or make findings concerning the accuracy of the juror's identification of Allen. The trial court's sentencing remarks do not indicate that the court relied on this incident as a basis for the sentence Allen received.

any previous acts of major dangerousness. However, the validity of his history is difficult to assess, secondary to his acknowledged pattern of lying when he feels threatened. Therefore, this report needs to be read and interpreted in conjunction with the other information available to the court.

As noted in the Assessment above, it is difficult to reconcile the person and beliefs he presents of himself, and his high intelligence, with the two incidents of criminal charges. However, in both cases, *even if* dangerous behavior was intended, it did not happen. Cooperation and naivete would be needed on the part of the female involved. Additionally, he was easily frightened himself from pursuing any further action in the California case, even if the "further action" was simply talking.... I believe that there is only a small degree of risk of dangerousness.

These views were echoed by Dr. James F. Harper, a clinical psychologist:

The issue of dangerousness is a contextual one. That is, dangerousness is not a factor in personality functioning, but rather lies in the interaction between a person's psychological makeup and specific circumstances. Mr. Allen has indicated his ability to act in an impulsive manner, although the dangerousness is more implicit than explicit. Even the alleged assault in California 10 years ago had a definite boundary, if for no other reason than some resistance on the part of the woman who Mr. Allen victimized. This moderate resistance was apparently enough for Mr. Allen to be able to control himself. In the phone conversations with [M.Q.], there is a degree of passivity and hesitation that seems to mitigate against his actually acting out any fantasies which he may have had. It is not felt that Mr. Allen poses any immediate dangerousness to others, and it is felt that he could function adequately under the supervision of his wife and through his employment. There appear to be sufficient monitors on Mr. Allen between his occupation and home situation that he is not likely to be out of view. From the examiner's point of view, Mr. Allen suffers more from emotional and psychological problems than from antisocial tendencies.

While all of the reports noted Allen's need for intensive, long-term therapy, none indicated a need for the therapy to occur in an institutional setting, and none suggested that it would be necessary to isolate Allen until he could receive treatment.

In imposing sentence, Judge Cutler focused initially on Allen's persistence in asserting his innocence. Saying that she had hoped Allen would admit his guilt, Judge Cutler indicated that she did not believe his denials. The judge told Allen, "you have a very horrible secret that you're covering up to yourself and everybody else." The judge expressed the belief that Allen's prognosis for treatment was poor, "because you haven't taken the first step that most of our sexual offenders need to take and that is of admitting that you have a problem."

Having reached this conclusion and having emphasized that Allen persisted in claiming innocence even in the face of overwhelming evidence of guilt, Judge Cutler declared her intent to incarcerate him until he was rehabilitated:

The evidence was overwhelming that you've done it. The phone calls were taperecorded and you still deny that they had the obvious intent that they had. And until you can come to grips with what you have done and with your problem, I am not going to release you from jail. Because women in this state have a right to be protected from people like you. They do. They just do. That's what sentencing is all about. Is protecting people from other people. I could not live with myself if I said, oh well, it's just a C felony, give him 6 months, let him go back on the street, hope he's going to go to counseling, and hope he isn't going to hurt anybody else. I'm not saying that you're responsible for women in unmarked graves. I'm not saying you're a potential rapist, but you clearly have a problem that needs to be treated before you're safe to live with the rest of

people. And you've hidden the problem so well from other people that's what makes you dangerous. That's really about all I have to say.

Judge Cutler turned next to the sentencing criteria articulated in *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970). Although the judge stated that her emphasis in sentencing would primarily be on rehabilitation, she made it clear that, in her view, public safety required that Allen be incarcerated until he received treatment:

[Y]ou've got to get treatment before it happens to somebody else again. And so the court's sentence is going to be primarily for purposes of treatment, but I think you need to be incarcerated in order to receive intensive treatment. Because I don't think you're going to be effectively treated until you recognize your problem. And you're clearly not going to recognize your problem if I just give you a suspended sentence and tell you to go back to work, and save your house, and so on and so forth. I also think you need to be isolated just to protect other people from you. As well as to be incarcerated to deter yourself. I don't think you're going to be deterred until you again recognize you have a problem.

In the judge's view, Allen required a period of "at least one year to eighteen months [of] intensive psychotherapy before you could be effectively treated. And I think you need to be incarcerated for a length of time that will provide for that kind of treatment."

Judge Cutler expressly recognized that Allen was a first felony offender who had been convicted of a class C felony and that he would therefore normally be subject to a sentence more lenient than the two-year presumptive term specified for a second felony offender. *See Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981). The judge further recognized that, viewed in isolation, Allen's conduct was not among the most serious within its class, and that it "certainly fits in the middle to less serious range of terroristic threatening...." In

addition, while Judge Cutler was aware that Allen was theoretically subject to consecutive terms because he was convicted of two separate counts, the judge found consecutive sentences to be inappropriate because Allen's threats were of a related, ongoing nature, involved the same victim, and were made within a fairly short span of time.

Nevertheless, Judge Cutler concluded that several statutory aggravating factors existed in Allen's case and that these factors justified imposition of a sentence exceeding the two-year presumptive term for a second felony offender. Specifically, the judge found that Allen had committed the offense with knowledge that his victim was particularly vulnerable (AS 12.55.-155(c)(5)); that his conduct towards the victim involved deliberate cruelty (AS 12.55.-155(c)(2)); that his prior criminal history included conduct involving assaultive behavior (AS 12.55.155(c)(8)); and that his conduct was knowingly directed "at a person because of their race, sex, color, or creed" (AS 12.55.155(c)(22)).

Relying on these factors, the judge sentenced Allen to concurrent terms of four years' imprisonment, with one year suspended. The judge expressly found that a sentence in excess of the two-year presumptive term for a second felony offender was necessary to protect the public.

In challenging this sentence as excessive, Allen argues that Judge Cutler erred in her findings concerning applicable aggravating factors and that the judge placed undue reliance on his refusal to acknowledge guilt. In our view, the sentencing issues raised by Allen are substantial, and the appropriateness of the sentence imposed below presents a close and difficult question. On balance, our independent review of the sentencing record convinces us that the sentencing court was clearly mistaken [5] in imposing a term of more than two years of unsuspended incarceration.

We agree with Judge Cutler's conclusion that Allen's conduct, when viewed in isolation, was not among the most serious

**5.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

within the definition of terroristic threatening. Allen's false report to M.Q. did not directly or immediately threaten death or serious physical injury. The risk of injury implicit in Allen's false report was a relatively passive one, which related to a single individual. The false report was made to only one person.

Nevertheless, while Allen's conduct may not have been exceptionally serious in and of itself, its seriousness was significantly enhanced by Allen's selection of a victim who was particularly vulnerable to being placed in fear. Clearly, Allen either knew or should have known of M.Q.'s vulnerability, and, in all likelihood, M.Q.'s vulnerability is precisely what caused Allen to focus on her as a victim.

Additionally, the similarity of Allen's prior California battery conviction certainly rendered his conduct significantly more serious, because the prior incident should have alerted Allen to the fact that misconduct of the type involved in this case would not be tolerated. *See, e.g., Goodman v. State,* 756 P.2d 918 (Alaska App.1988).

Finally, Allen's denial of responsibility, as well as his unwillingness or inability to acknowledge that he has any problem, can certainly be taken into account in determining an appropriate overall sentence, because these considerations reflect poorly on Allen's prospect for rehabilitation.

To this extent, we believe that Judge Cutler was correct in concluding that Allen deserved a sentence that is substantially more severe than a typical sentence for a first-felony offender who has been convicted of a class C felony. In our view, the totality of the circumstances in this case support the imposition of a substantial term of imprisonment.

However, the term of four years with one year suspended actually imposed in the present case is a particularly severe one for a class C felony; it would amount to an aggravated sentence even for an offender

who had previously been convicted of two felonies. The reasons relied on by the sentencing court to justify the imposition of this unusually severe term are problematical.

In concluding that Allen's crime deserved to be treated as a particularly aggravated first offense, Judge Cutler found four statutory aggravating factors to be applicable to his case. The judge placed little reliance on one of the factors.[6] As we have already indicated, the judge properly emphasized M.Q.'s vulnerability as contributing to the seriousness of Allen's offense. With respect to the two remaining aggravating factors that she found, however, Judge Cutler committed error.

Judge Cutler found that Allen's conduct amounted to deliberate cruelty in view of its effects on M.Q. While it is unquestionable that the emotional trauma suffered by M.Q. was extraordinarily serious and that the knowing infliction of such harm can readily be characterized as cruelty, we have previously held that "deliberate cruelty," as used in AS 12.55.155(c)(2), applies only when cruelty is "inflicted gratuitously or as an end in itself." *Juneby v. State,* 641 P.2d 823, 840 (Alaska App.1982), *modified in part,* 665 P.2d 30 (Alaska App. 1983). There was no finding here that Allen's conduct toward M.Q. was gratuitously cruel, nor does this appear to be the case from the record. It does not appear that Allen's express purpose in contacting M.Q. was to inflict emotional suffering upon her. Under the circumstances, this aggravating factor is not supported by the record.

Judge Cutler also concluded that Allen's 1975 battery conviction qualified under AS 12.55.155(c)(8) as "conduct involving aggravated or repeated instances of assaultive behavior." The state correctly concedes that Allen's single prior episode of battery would not suffice to establish this aggra-

6. With reference to the aggravating factor specified in AS 12.55.155(c)(22), Judge Cutler noted that the fact that Allen's crime was directed at the victim because of her sex was in "the nature of what happened here as opposed to being what I would call discriminatory, which is what I think [the aggravating factor] goes at." Accordingly, the judge indicated that she would give little consideration to the existence of the aggravating factor.

vating factor. *See Nashoalook v. State,* 744 P.2d 420, 422 (Alaska App.1987).

■■■ Even more troublesome than the court's errors in finding these two aggravating factors is its conclusion that Allen must be incarcerated in order to assure that he receives treatment. Particularly in the case of a first felony offender convicted of a class C felony, the goal of rehabilitation should receive primary consideration in sentencing where psychiatric problems, rather than general criminal intent, lie at the root of the criminal behavior. *See, e.g., Ferreira v. State,* 602 P.2d 803, 805 (Alaska 1979); *see also Gest v. State,* 619 P.2d 724, 726 n. 8 (Alaska 1980). It is difficult, however, to justify a sentence of imprisonment by the defendant's need for rehabilitation:

> There is a growing consensus that rehabilitation of an offender, as distinct from his deterrence, should not serve as a basis for extending a prison term or selecting imprisonment as a sentence. *See* ABA Standards for Criminal Justice, Sentencing Alternatives and Procedures § 18–2.2 at 18.57 (Approved Draft 1979). "The view of rehabilitation taken by these standards involves a critical distinction: rehabilitation is a proper *goal* of corrections but an improper *justification* for it. It is desirable that offenders have access to treatment but undesirable that they be sentenced to prison for treatment." (Emphasis added.) *Id.* § 18–2.6, at 18.141.

*Pears v. State,* 698 P.2d 1198, 1204 (Alaska 1985).

Here, Judge Cutler relied on the psychiatric and psychological evaluations in the record to support the conclusion that Allen needed to be incarcerated to receive treatment. Yet the evaluations do not support the sentencing court's conclusion. They do clearly establish that Allen needs long-term therapy to address his personality disorder and generally support the view that he poses some risk of future similar misconduct if he goes untreated. Two of the reports, Dr. Harper's and Dr. Geeseman's, emphasize that, to the extent Allen poses a future risk, the extent of the risk seems to be limited. The third report, Dr. Spernack's, is silent on the issue.

Dr. Geeseman's report expressly concludes that the resources available for supervision through Allen's family, church, and job would be sufficient to minimize the possibility of a further offense. This point is not specifically addressed in either of the other two evaluations, but there is nothing in them to imply a contrary conclusion. Furthermore, there is nothing in any of the reports to support the conclusion that Allen needs to be incarcerated until he completes long-term psychotherapy or, for that matter, that Allen's treatment needs could not completely be addressed outside an institutional setting.

Given the lack of support in the psychological evaluations for the trial court's conclusion, and given further that Allen's sole prior incident of similar criminal misconduct occurred almost ten years before the conduct that led to his conviction in the present case, we believe the sentencing court was clearly mistaken in finding it necessary to isolate Allen from the community until his treatment has been fully completed.

We have noted in previous cases that the "just deserts" model of sentencing adopted by our legislature seeks to focus on the nature and seriousness of an offender's past and current misconduct, rather than on speculative predictions of future dangerousness. *See Skrepich v. State,* 740 P.2d 950, 956 (Alaska App.1987); *Maal v. State,* 670 P.2d 708, 712 (Alaska App.1983). In our view, the approach taken by the sentencing court places disproportionate emphasis on the prediction of Allen's future conduct. Considering the nature and extent of Allen's past and current offenses, and giving due regard to his limited prospects for rehabilitation, we believe that a term of up to two years of unsuspended incarceration would be warranted. Such a term, coupled with an additional year of suspended incarceration and probationary supervision, would suffice to protect the community, to provide motivation for Allen to receive treatment, and to deter Allen in the event he is not otherwise inclined to rehabilitation. We find that a more severe

sentence, however, would be clearly mistaken.

The conviction is AFFIRMED. The sentence imposed below is VACATED, and this case is REMANDED for resentencing in conformity with the provisions of this opinion.