Kimberly PATTERSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–573.

Court of Appeals of Alaska.

Nov. 8, 1985.

Rehearing Denied Dec. 10, 1985.

Linda Wilson, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

David Mannheimer and Robert D. Bacon, Asst. Attys. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Kimberly M. Patterson was charged with first-degree robbery, and a jury found her guilty but mentally ill. AS 11.41.500(a)(1); AS 12.47.030. She appeals her conviction, contending that Alaska's current insanity statutes, AS 12.47.010 *et seq.*, violate the state and federal constitutional guarantees of (1) due process, (2) equal protection, and (3) the prohibition against cruel and unusual punishment. We reject Patterson's general arguments that the statutory scheme is unconstitutional, relying on *Hart v. State*, 702 P.2d 651 (Alaska App.1985). *See also, State v. Alto*, 589 P.2d 402, 405 (Alaska 1979). However, we reverse Patterson's conviction based on an instruction given the jury by the trial court, which in our view prejudiced the defense.

At trial, Patterson did not contest the state's proof that she committed the physical aspects of the crime of first-degree

robbery by pointing a loaded gun at a man in the Anchorage International Airport and demanding money from him. Rather, she depended on the affirmative defense of insanity, AS 12.47.010, contending that she should not be held responsible for her conduct because she was unable, as a result of mental disease or defect, to appreciate the nature and quality of that conduct.

Patterson presented several witnesses who testified concerning her behavior and mental state up to and including the time of the robbery. Her mother testified that Patterson, who was twenty years old and the mother of a three-year-old daughter, began acting strangely several months before the robbery, after being rejected by her child's father. Patterson laughed inappropriately, stayed up all night, read aloud, appeared to hear voices, and talked to herself. She had delusions that three men were in her room and were going to hurt, perhaps rape, her and her daughter. Her mother took Patterson to an out-patient mental health clinic where she was put on antipsychotic medication. This medication had extremely unpleasant side effects, and she eventually stopped taking it.

Patterson's mother testified that shortly before the robbery Patterson began trying to obtain money so that she could move out of her mother's house and escape the three men who she believed were tormenting her. She tried unsuccessfully to borrow money from banks. A short time later she took a bus to the Anchorage International Airport and, using a gun which she had recently bought, attempted to rob the first man she saw in the parking lot. Her victim was able to wrestle the gun away, grab Patterson, and tell the parking cashier to call the police.

Two expert witnesses, Dr. James Harper, a clinical psychologist, and Dr. Irvin A. Rothrock, a psychiatrist, also testified for Patterson. Both diagnosed her as paranoid schizophrenic, suffering from auditory hallucinations and delusions of persecution. Dr. Harper diagnosed her as also having mild to moderate brain damage which affected her ability to form normal judgments. Dr. Rothrock found her to be either mildly retarded or dull-normal. Both doctors testified that Patterson had delusions that three men were trying to harm her and her daughter. Both believed that her reason for attempting the robbery stemmed from this delusion: Patterson believed that she needed money to move away from her mother's home to protect herself and her daughter. Dr. Harper testified that he believed that Patterson's emotional appreciation of what she was doing was based on her delusions.

Dr. Harper testified in response to questions from the prosecutor that Patterson knew physically what she was doing when she pointed the loaded gun at her victim and demanded money from him, and therefore in his opinion Patterson did not meet the test of insanity under Alaska law. Dr. Rothrock also testified that, in his opinion, Patterson was able to appreciate the nature and quality of her conduct.

## DISCUSSION

### I.

Alaska Statute 12.47.010, insanity excluding responsibility, provides that, "In a prosecution for a crime, it is an affirmative defense that when the defendant engaged in the criminal conduct, the defendant was unable, as a result of mental disease or defect, to appreciate the nature and quality of that conduct." Alaska Statute 12.47.-030, guilty but mentally ill, provides in part that, "A defendant is guilty but mentally ill if, when the defendant engaged in the criminal conduct, the defendant lacked, as a result of mental disease or defect, the substantial capacity either to appreciate the wrongfulness of that conduct or to conform that conduct to the requirements of the law."

Patterson argues on appeal that these laws deny her due process and equal protection, and subject her to cruel and unusual punishment. She perceives the laws as allowing her to be found guilty without any conscious wrongdoing or criminal intent on her part. Recently, in *Hart v.*

*State,* 702 P.2d 651 (Alaska App.1985), we rejected similar contentions. As we noted in *Hart,* the insanity law does not allow the jury to convict a defendant in the absence of proof beyond a reasonable doubt that he or she engaged in conscious voluntary acts and possessed the requisite *mens rea* for the offense. *Id.* at 655–56. The insanity defense exists separate from, and in addition to, the defense's right to produce psychiatric evidence to show diminished capacity. *See* AS 12.47.020. The defendant cannot be found guilty or guilty but mentally ill unless the state first proves all of the elements of the offense, including the *mens rea,* beyond a reasonable doubt.

Patterson argues, however, that in her case Jury Instruction No. 16 operated to place the burden on her to prove that she did not have the requisite *mens rea.* Jury Instruction No. 16 provided in part:

> The defendant has asserted that, at the time the offense is alleged to have occurred, she suffered from a mental disease or defect that may affect her legal accountability for the conduct alleged in the indictment.

> Before you begin your consideration of the issues raised by the defendant's assertion of mental disease or defect, you must first be satisfied beyond a reasonable doubt that the defendant actually performed the *physical* acts necessary for the crime of robbery in the first degree—that she threatened another person with a gun at the time and place alleged in the indictment.

> .    .    .    .    .

> [I]f you are satisfied beyond a reasonable doubt that the defendant threatened another person with a gun at the time and place alleged in the indictment, then you should proceed to determine the issues relating to mental disease or defect. [Emphasis added.]

■ We agree with Patterson that Instruction 16 confused the defense of insanity with the culpable mental state required for a robbery conviction. We are concerned that Instruction 16 merged insanity and *mens rea* in a manner that makes it impossible to say with assurance whether the jury actually found that Patterson acted with the *mens rea* required for a conviction of robbery.

Before the jury even reached the affirmative defense of insanity, Patterson should have been entitled to a determination that the state had met its burden of proof with respect to both the *actus reus* and *mens rea* elements of the offense. *See Alto,* 589 P.2d at 404 n. 4 and accompanying text. *Cf. Kinsman v. State,* 512 P.2d 901 (Alaska 1973) (discussing the need for separate determination of guilt and sanity). The jury should not have considered and decided the issue of insanity unless it was prepared to conclude that the state's proof was otherwise sufficient to convict, for if it could not reach this threshold conclusion, Patterson was entitled to an acquittal, without reference to the insanity defense.

Unfortunately, the jury in this case was directed by Instruction 16 to consider and decide the issue of insanity after a threshold determination of *actus reus* only,[1] and before any consideration of culpable mental state. This instruction diluted the state's burden of proving culpable mental state in three separate but closely related ways. First, the instruction paved the way for the jury to treat the issues of insanity and culpable mental state as being indistinguishable, thereby inviting a decision of the two separate issues as one issue. Second, by inviting merged consideration of these two issues, the instruction created the very real risk that the jury would decide the issue of culpable mental state by the standards spelled out for the insanity defense: whether the defendant had met the burden

---

**1.** Instruction 16 was also incomplete, since it told the jury to determine whether the defendant threatened another person with a gun, but omitted any mention of the concomitant need to determine whether she committed a taking or an attempted taking of property and whether that property was in the immediate presence and control of the victim. Both of these determinations are necessary elements of the offense of robbery and are aspects of *actus reus* rather than culpable mental state.

of proof on the issue by a preponderance of the evidence. Third, by prematurely directing the jury's attention away from the mental elements of the offense and onto the issue of insanity before addressing culpable mental state, the instruction engendered the possibility that the jury might lose sight of the culpable mental state requirement altogether.

The deficiencies in Instruction 16 were not cured by other instructions in the case. It is true that two subsequent instructions referred in general terms to the need to find that the state had met the burden of proving its case, including culpable mental state. Yet, in context, these generalized references could readily have been perceived by the jury to be redundant—to be addressing issues already considered and decided under the more specific procedures set forth in Instruction 16. The crucial point is that after specifically channeling the jury's attention from *actus reus* directly to insanity without mention of culpable mental state, neither Instruction 16 nor any other instruction ever reminded the jury, in anything approaching express and unambiguous terms, of the residual need to decide the vital issue of culpable mental state. Without an express and an unambiguous instruction, it is virtually a foregone conclusion that the jury would adopt the detailed, specific and explicit directions of Instruction 16 as its decisional road map. In context, we find that Instruction 16 prejudiced Patterson and that she is entitled to receive a new trial.

## II.

The trial court instructed the jury on the meaning of AS 12.47.010 as follows:

### INSTRUCTION NO. 20

A person is "unable to appreciate the nature and quality of her conduct" for purposes of the insanity defense if, because of mental disease or defect, she did not understand that she was performing the physical acts which are part of the crime of which she is charged.

In this case, the defendant has been charged with threatening another person with a gun in an attempt to take his money. If you find beyond a reasonable doubt that she did this, but if you also find that because of mental disease or defect she did not understand that she was threatening another human being or did not understand that she was demanding money from him, then the defendant would be legally insane under this definition and your verdict should be "not guilty by reason of insanity."

However, if the defendant did in fact understand the basic nature and quality of her conduct—that she was threatening another person in an attempt to obtain his money—then the defendant would not be entitled to a verdict of "not guilty by reason of insanity," even though her reason for doing this might have resulted from a delusion caused by a mental disease or defect.

### INSTRUCTION NO. 21

To "appreciate the nature and quality" of an act means to fully understand or comprehend the act.

The phrase, "appreciate the nature and quality of [her] conduct" is a modification of the language of part of the traditional *M'Naghten* test of insanity, which excused a person from criminal responsibility, *inter alia*, if he did not "know the nature and quality of his act." [2] *See Hart,* 702 P.2d at 655. As *Hart* points out, this phrase is ambiguous. The phrase can refer to the mere physical aspects of an act, or to all its aspects including its likely consequences to the actor and others. *Hart,* 702 P.2d at

---

**2.** The traditional *M'Naghten* test provided:
"to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."
*Chase v. State,* 369 P.2d 997, 998 n. 2 (Alaska 1962), *quoting M'Naghten's Case,* 8 Eng.Rep. 718, 722 (H.L.1843).

654 n. 2, *citing* Note, *Criminal Insanity,* UCLA-Alaska L.Rev., 8 Alaska L.J. 152, 152–53 (August 1970).

In *Chase v. State,* 369 P.2d 997, 999–1003 (Alaska 1962), the traditional phrase was given a broad reading by the Alaska Supreme Court. In that case, the trial court had instructed the jury that the defendant was not guilty by reason of insanity if he was incapable of "knowing the nature and quality of his act *and* of distinguishing between right and wrong" in connection with the crime charged. The court in effect merged the two prongs of the test. As originally written and as applied by many courts, the *M'Naghten* test was in the disjunctive rather than the conjunctive. In determining that joining the two prongs of the test with an "and" was not reversible error, the supreme court said:

> [Some] courts that have considered the question have held that there is no distinction between ability to know the nature and quality of an act and the ability to know whether the act was wrong. For example, in *Jessner v. State,* [202 Wis. 184, 231 N.W. 634, 639 (1930)], the Supreme Court of Wisconsin held that the two phrases—
>
>> "express exactly the same thing, but in different language. They are synonymous, and their conjunctive use results only in emphasis. If a person is unable to distinguish between right and wrong in respect to an act, he must be unaware of the nature and quality of the act which he is doing. . . ."
>
> To hold it reversible error to use the two phrases conjunctively would, in our opinion, infer that the intellect must be divided into two distinct parts. One part would be rational so that the nature and quality of the act would be understood; the other part would be irrational so there could be no understanding that the act was one generally condemned by the community and therefore wrongful. The apparent implication here would be that one mind could be simultaneously normal and abnormal, sane and insane. That

this could be is not supported by established medical or psychiatric principles that have come to our attention, nor by our own study and experience and knowledge in the field of human behavior.

*Chase,* 369 P.2d at 1002–03 (footnote omitted).

We noted in *Hart* that it is a well-established principle of statutory construction that when the legislature re-enacts language that has previously been judicially construed, it is presumed to be aware of the previous construction and to use the language in the sense given it by the court. *Hart,* 702 P.2d at 655, *citing Marina Pt., Ltd. v. Wolfson,* 30 Cal.3d 721, 180 Cal. Rptr. 496, 504, 640 P.2d 115, 123 (1982). In the language at issue, as we also noted in *Hart,* when the legislature enacted the statute, it made two changes. It changed the word "know" to "appreciate" in apparent reliance on the ALI Model Penal Code formulation of the insanity test, and it changed the word "act" to "conduct." *Cf.* AS 11.81.900(b)(5) ("conduct" means an act or omission and *its accompanying mental state*) (emphasis added). Both of these changes would appear, if anything, to broaden the language originally construed in *Chase.*

Jury Instruction No. 20, however, gave the language of AS 12.47.010 a very narrow reading, interpreting it as referring only to the defendant's awareness of the actual physical act he or she was performing. This reading of the statute may have been influenced by the House Judiciary Committee report which accompanied enactment of the law. The committee report said:

> An example of a person who could successfully establish the elements of the revised insanity defense is the defendant who, as a result of mental disease or defect, is unable to realize that he is shooting someone with a gun when he pulls the trigger on what he believes to be a water pistol, or a murder defendant who believes he is attacking the

ghost of his mother rather than a living human being. Conversely, this defense would *not* apply to a defendant who contends that he was instructed to kill by a hallucination, since the defendant would still realize the nature and quality of his act, even though he thought it might be justified by a supernatural being. Such a defendant could be determined guilty but mentally ill under AS 12.47.030.

House Journal Supplement No. 63 at 6, 1982 House Journal 2356.

■ We are aware that committee reports generally may prove helpful in determining legislative intent when construing statutes. *See, e.g., Roderick v. Sullivan,* 528 P.2d 450, 454 and n. 9 (Alaska 1974). They are not necessarily decisive, however. *See id.; Highton v. Musto,* 186 N.J.Super. 281, 452 A.2d 487 (1982). In this case, given the *Chase* court's previous broad construction of the traditional language, and given the legislature's change in that language, which, if anything, would tend to broaden rather than restrict the application of the test, we believe that the trial court, if it did rely on this committee report as establishing the meaning of the statute, erred in doing so. Consistent with *Chase,* we believe that the language which now appears in AS 12.47.010 is to be interpreted broadly rather than restrictively, referring not only to the defendant's bare awareness of the physical acts he or she is performing, but also to his or her appreciation of the nature and quality of that conduct and its consequences.[3]

In reaching this conclusion, we find it particularly noteworthy that the legislature substituted the word "conduct" for the word "act." In order for Patterson to be found insane, the jury was required to find that she was incapable of appreciating the nature and quality of her conduct. As defined in the Revised Criminal Code, "conduct" means an act or omission "and its accompanying mental state." AS 11.81.-900(b)(5). Applying the statutory definition of "conduct," it becomes apparent that, in order to be sane, it was necessary for Patterson to be aware of more than just the nature and quality of her "acts." Arguably, she was, in addition, required to be capable of appreciating the nature and quality of the mental state that accompanied her acts.

Consistent with the *M'Naghten* test, we understand this to mean that she had to have the capacity, at least, to a limited extent to forsee the likely consequences of her acts, and to evaluate the effect those consequences would have on herself and others. We stress that it is Patterson's capacity to foresee and evaluate rather than her exercise of that capacity in a given case that is the issue to be determined by the jury. In our view, therefore, the law governing the insanity defense has been restored to the position discussed and approved in *Chase.* We think the plain meaning of the statutory terminology chosen by the legislature is highly significant, and we find that it persuasively counterbalances the seemingly inconsistent expressions of legislative intent expressed in the legislative committee report.

Patterson does not specifically object on appeal to the restrictive language of Jury Instruction 20, though she did make an

---

**3.** The *M'Naghten Rules* were published in 1843. This was during the rise of the utilitarian school of ethics in England. *See* E. Albee, *A History of English Utilitarianism passim* (paperback ed. 1962). To a utilitarian, the rightness or wrongness of an act depends on its consequences. Smart, *Extreme and Restricted Utilitarianism,* in *Theories of Ethics* 171 (P. Foot ed. 1967). An act is morally right if its good consequences preponderate over its bad consequences and conversely it is morally wrong if its bad consequences preponderate. (*Ibid.*) If the right-

wrong test adopted in *M'Naghten* is read in light of the utilitarian theory, then someone is able to know whether his acts are right or wrong if he is able to understand their likely consequences. Viewed in this way, the decision of the *Chase* court that the two prongs of the *M'Naghten* test merge is not unreasonable. A person cannot be said to understand the nature and quality of his or her acts if ignorant of their consequences. To know the consequences is the same as to know whether the act that produces those consequences is right or wrong.

objection below to its second two paragraphs. Therefore, the instruction would have to be analyzed under the "plain error" standard. Alaska R.Crim.P. 47(b). Our decision that error in Instruction 16 requires a new trial for Patterson makes it unnecessary for us to decide if Instruction 20 constituted "plain error."

The judgment of the superior court is REVERSED and this case REMANDED for new trial.[4]

---

**4.** Patterson also challenges the constitutionality of the "guilty but mentally ill" verdict. Because of our disposition of the case, it is not necessary for us to reach this issue here.