**Ralph N. WELLS, Appellant,**

v.

**STATE of Alaska, Appellee.**

Nos. A–8645, A–8661.

Court of Appeals of Alaska.

Dec. 10, 2004.

Robert S. Noreen, Law Office of Robert S. Noreen, Fairbanks, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Ralph N. Wells lived in Salcha with Tina Woellert and her nine-month-old son, G.W. While Wells was caring for G.W., G.W. sustained numerous bruises on his head. A jury convicted Wells of third-degree assault (for recklessly causing G.W. physical injury that reasonably required medical treatment when Wells was 18 or older and G.W. was under 10 years of age).[1] Based on this conviction, the superior court revoked Wells's probation on a prior conviction for removal of identification marks.[2]

Wells argues that there was insufficient evidence to conclude that Wells had recklessly caused G.W.'s injuries. Second, Wells argues that there was insufficient evidence that G.W.'s injuries reasonably required medical treatment. Wells argues that because there was insufficient evidence to support his conviction, the superior court erred when it revoked his probation.

Wells's first argument fails because the State presented circumstantial evidence that G.W. was in Wells's care when he was injured, that Wells persuaded Woellert not to take G.W. to the hospital the day he was injured, and that Wells's explanation of how G.W. was injured was contradicted by the medical evidence. However, we accept Wells's second argument because the term "medical treatment" in AS 11.41.220(a)(1)(C)(i) is susceptible of more than one meaning, and under the meaning most favorable to Wells, the medical care that G.W. received was not "treatment." Accordingly, we must reverse Wells's third-degree assault conviction. Because we reverse Wells's conviction, the superior court must reconsider its decision to revoke Wells's probation.

### Background facts and proceedings

On September 22, 2002, Wells called Woellert at her workplace and reported that G.W. had piled blankets and toys inside his crib to crawl out and had fallen out of the crib. Although Woellert thought that G.W. should go to the hospital, Wells convinced her that was unnecessary. Wells called Woellert back and told her that he had phoned a doctor at the hospital, and was told by the doctor that if G.W. was acting normally, it was not necessary to take him to the hospital. Wells also reported that the doctor recommended that he keep G.W. awake for two hours, in case G.W. had a concussion, and that if G.W. fell asleep and stopped breathing, to administer CPR. When Woellert saw G.W. after work, she noticed "lots of bruises" on his head.

Woellert took G.W. to Fairbanks Memorial Hospital the next day. Dr. Sean Wormuth, an emergency room physician, examined G.W. Dr. Wormuth found numerous bruises on G.W.'s scalp, face, and ears. Dr. Wormuth ordered a CT scan of G.W.'s head to check for any brain injury. In addition, Wormuth ordered lab tests to determine whether G.W.'s blood was clotting normally, or whether a bleeding disorder was causing the bruising. Dr. Wormuth contacted Dr. James Foote, another physician, to ensure that he would examine G.W. later to determine whether G.W. was healing properly. Foote examined G.W. two days later.

---

1. AS 11.41.220(a)(1)(C)(i).

2. AS 11.46.260(a).

*Was there sufficient evidence that Wells assaulted G.W.?*

■ Wells argues that there was insufficient evidence to support the jury's finding that Wells had recklessly caused G.W.'s injuries. Viewing the evidence presented at trial in the light most favorable to upholding the verdict, the evidence is sufficient to support a conviction if fair-minded jurors could find the defendant guilty beyond a reasonable doubt.[3]

The State presented evidence that G.W. sustained the head injuries while in Wells's care. Woellert testified that she had not seen G.W. the morning of the incident, but that he was not bruised when she put him to bed the night before. Woellert also testified that Wells had claimed that G.W. piled blankets and toys inside his crib to climb out and had fallen out of the crib. In addition, Woellert testified that, on the day G.W. was injured, Wells persuaded her not to take G.W. to the hospital.

Dr. Wormuth and Dr. Foote testified that G.W. was incapable of piling his belongings up in the crib to climb out, as Wells had claimed. Both doctors also testified that G.W.'s injuries were inconsistent with a fall from his crib. Dr. Wormuth explained that a fall from the crib could not have caused G.W.'s injuries because G.W. had bruises on every surface of his head. In contrast, a fall would injure only one side of the skull at a single point of impact. Also, because G.W.'s bruises were in differing stages of healing, he could not have sustained them in a single fall. Finally, Dr. Foote testified that G.W. could not have caused his head injuries by banging his head against his crib because he could not have generated enough force to cause injuries as severe as those he had sustained. Because the State presented sufficient circumstantial evidence that could have convinced a reasonable juror that Wells recklessly caused G.W.'s injuries, Wells's argument fails.

*Did G.W.'s injuries reasonably require medical treatment?*

■ Wells argues that there was insufficient evidence to support the jury's finding that G.W.'s injuries reasonably required "medical treatment." Wells argues that because both Dr. Wormuth and Dr. Foote testified that they had determined G.W.'s bruises would heal naturally, medical treatment was not reasonably required.

If the answer to this question only required us to consider the sufficiency of the evidence presented, the answer is obvious because Dr. Wormuth testified that G.W.'s injuries required medical treatment.

But Wells actually raises a question that he did not present to the superior court. Wells moved for a judgment of acquittal after the State rested its case, but mentioned nothing concerning the failure to prove medical treatment. The jury instructions provided no definition of medical treatment. Wells did not object to the instructions, nor did he ask that the court define medical treatment.

During final argument, Wells contended that G.W. did not reasonably require medical treatment because the child's injuries "healed on their own," implying that medical treatment requires some form of remedy or active intervention. In rebuttal, the prosecutor discussed medical treatment.

*Prosecutor:* Medical treatment, what does medical treatment mean? Medical treatment means something different between lay people and doctors. When lay people think of medical treatment, they think of a cast. They think of a bandage. When a doctor thinks of medical treatment, it's broader than that. What did the doctors testify about what medical treatment meant to them? Medical treatment meant seeing the injury, analyzing the injury, diagnosis, x-rays, CAT scans, and then if any further treatment was necessary, then further treatment. CAT scans and x-rays, those things are medical treatment. That's what's meant by medical treatment. Did this baby need to go to the doctor? Yes. Did this baby need to be seen by a doctor, analyzed? Yes. Treated by a doctor? Yes. That's medical treatment. Just because the injuries heal without casts or surgery doesn't mean [that] it's not medical treatment.

**3.** *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981).

Wells did not object to the prosecutor's discussion of medical treatment (nor has he claimed in this appeal that the prosecutor's argument misled the jury). Wells did not ask the court to provide any contrary or clarifying instruction to the jury on medical treatment before it retired to deliberate.

Immediately after the jury convicted Wells and was excused, Wells again moved for a judgment of acquittal, but did not assert that there was any deficiency regarding "medical treatment." If the jury needed a definition of "medical treatment," Wells could have requested an instruction. Because Wells made no objection to the instructions at trial, we review this question for plain error.

The evidence shows that the course of care that G.W. received was intended to promote G.W.'s physical health. When Dr. Wormuth saw G.W. in the emergency room, G.W. had numerous bruises on his scalp, face, and ears. Dr. Wormuth concluded that testing was warranted to examine whether there was any hemorrhaging in G.W.'s brain. G.W. was sedated intravenously to immobilize him for a CAT scan. Dr. Wormuth also ordered blood testing to check if G.W. had a blood disorder that exacerbated the bruising. Later, when Dr. Wormuth contacted Dr. Foote, the two physicians decided that G.W. was stable enough that he did not have to be admitted to the hospital. Instead, they scheduled a follow up with Dr. Foote in two days to make sure that G.W. was progressing.

Obviously, G.W. received more than first aid for his injuries. Dr. Wormuth concluded that G.W.'s injuries were of such magnitude that he needed to examine G.W. for internal bleeding and also make sure that his progress was monitored after he left the hospital.

Alaska Statute 11.41.220(a)(1)(C)(i) provides that a person commits third-degree assault if the person recklessly "while being 18 years of age or older ... causes physical injury to a child under 10 years of age and the injury reasonably requires medical treat-ment[.]" The legislature did not specifically define "medical treatment." Wells contends that to prove "medical treatment," the State must prove that the victim needs something more than medical attention.

In *S.R.D. v. State*,[4] a decision issued before the enactment of AS 11.41.220(a)(1)(C)(i), one of the appellants was convicted of three counts of criminal nonsupport. That appellant claimed that the evidence was insufficient to establish criminal nonsupport because the children did not require any medical treatment. However, the criminal nonsupport statute penalizes a parent's failure to provide a child with necessary "medical attention."[5] And we agreed with the State's argument that "medical attention" expressed a broader concept than "medical treatment."[6]

> We agree with the state that "attention" must be construed more broadly than "treatment." It is conceivable that children may suffer injuries sufficiently threatening to require a medical examination, even if that examination ultimately discloses no need for treatment.
>
> In the present case, evidence concerning A.D.'s and S.E.D.'s injuries and the manner in which those injuries were inflicted was sufficient, when viewed in the light most favorable to the state, to permit a reasonable juror to infer that, even though no treatment was required, medical attention was actually necessary to rule out the possibility of life-threatening or potentially disabling conditions.[7]

■ When the legislature uses a word or phrase but does not define it, a court should normally assume that the legislature intended the word or phrase to have its common, ordinary meaning.[8] The legislature has enacted other statutes that addressed the medical process. For example, in AS 18.20.130(3), the legislature provided that " 'hospital' means an institution or establishment, public or private, devoted primarily to providing

4.  820 P.2d 1088 (Alaska App.1991).

5.  AS 11.51.120(b).

6.  *S.R.D.*, 820 P.2d at 1090.

7.  *Id.* at 1090–91.

8.  *See* AS 01.10.040; *Lynch v. McCann*, 478 P.2d 835, 837 (Alaska 1970); *Lambert v. State*, 694 P.2d 791, 793 (Alaska App.1985).

*diagnosis, treatment, or care* " (emphasis added). And in AS 25.20.025(a)(4), the legislature declared that all minors (even those who are unemancipated and who are still living with a parent or guardian) have the legal authority to consent to a broad range of medical services and treatments associated with sexual activity (except abortion), including *"diagnosis, prevention or treatment* of pregnancy, and ... *diagnosis and treatment* of venereal disease" (emphasis added). Additionally, in AS 47.17.290(7), the legislature provided that " 'institution' means a private or public hospital or other facility providing medical *diagnosis, treatment, or care* " (emphasis added).

Our supreme court recognized a similar distinction in the Rules of Evidence. Alaska Rule of Evidence 504(b) provides in part: "A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of *diagnosis or treatment* of the patient's physical, mental or emotional conditions" (emphasis added). And Evidence Rule 803(4) provides:

> Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical *diagnosis or treatment* and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to *diagnosis or treatment.*

(Emphasis added.)

In case law, our supreme court has also used the terms "diagnosis" and "treatment" as expressing different steps in the medical process. For example, in *Bradbury v. Chugach Electric Ass'n,*[9] the court stated: "Two physicians, Dr. Kenneth Flora and Dr. David Nelson, testified on behalf of Chugach Electric. Dr. Flora is a hepatologist whose sub-

specialty is the diagnosis and treatment of chronic liver disease."[10]

When the scope of a criminal statute is unclear, courts should normally construe the statute against the government—that is, construe it so as to limit the scope of criminal liability.[11] And when a word or phrase has been construed in a particular way—as we construed the word "treatment" in *S.R.D. v. State*—courts are to presume that later-enacted statutes carry forward the existing judicial construction of that word or phrase.

At best, the construction of "medical treatment" in the statute that is endorsed by the State, and the construction that was advocated by the prosecutor in summation to the jury, is only arguable. We therefore must interpret the statute against the government.[12] Accordingly, we conclude that we must reverse Wells's conviction.

If the State elects not to re-prosecute Wells for third-degree assault, the superior court may enter judgment against Wells for fourth-degree assault[13] because the jury's verdict necessarily found that Wells had recklessly caused physical injury to the victim.[14]

*Why we vacate the superior court's revocation of Wells's probation*

The superior court revoked Wells's probation in his conviction for removal of identification marks because he was convicted of third-degree assault in this case. Because we reversed Wells's third-degree assault conviction, we vacate the probation revocation.

However, as we discussed above, the jury necessarily found that Wells recklessly caused physical injury to G.W. That jury finding is sufficient to support a conviction

---

9. 71 P.3d 901 (Alaska 2003).

10. *Id.* at 905.

11. *See State v. ABC Towing,* 954 P.2d 575, 579 (Alaska App.1998); *Magnuson v. State,* 843 P.2d 1251, 1253 (Alaska App.1992).

12. *See Brookins v. State,* 600 P.2d 12, 17 (Alaska 1979); *Whitesides v. State,* 88 P.3d 147, 151

(Alaska App.2004); *State v. Andrews,* 707 P.2d 900, 907 (Alaska App.1985); *State v. Rastopsoff,* 659 P.2d 630, 640 (Alaska App.1983).

13. AS 11.41.230(a)(1).

14. *See Nathaniel v. State,* 668 P.2d 851, 857 n. 4 (Alaska App.1983); *Nix v. State,* 624 P.2d 823, 824–25 (Alaska App.1981).

for fourth-degree assault. In addition, this jury finding would be sufficient for the superior court to exercise its discretion to revoke Wells's probation. Accordingly, we direct the superior court to reconsider the petition to revoke Wells's probation.

*Conclusion*

The judgment of the superior court is RE-VERSED.

MANNHEIMER, Judge, concurring.

Under AS 11.41.220(a)(1)(C)(i), a person commits the crime of third-degree assault (a class C felony) if they recklessly cause physical injury to a child under the age of 10, and if this injury "reasonably requires medical treatment". Our task in this appeal is to determine what the legislature meant by the phrase "medical treatment".

*The legislative history of AS 11.41.220(a)(1)(C)*

AS 11.41.220(a)(1)(C) began life as House Bill 396 in the Seventeenth Legislature (1991–92). As originally proposed, Section 4 of HB 396 would have added a provision to the third-degree assault statute to make a person guilty of that felony if they "violate[d] AS 11.41.230(a)(1) or [ (a) ](2)"—*i.e.*, if they committed fourth-degree assault by reckless-ly causing physical injury to another person, or by negligently causing physical injury to another person by means of a dangerous instrument—and if "the victim of the offense [was] under the age of 10".

This proposed change was criticized by the Alaska Action Trust (the lobbying arm of the Alaska Association of Trial Lawyers).[1] In a "position paper" on House Bill 396, the Trust argued that the proposed change to the third-degree assault statute was "too broad and should not be adopted". The Trust wrote:

Apparently, the Legislature's [purpose] is to make it a felony rather than a misde-meanor to repeatedly or severely beat a child. While we agree that it may well be appropriate to make repeated or severe beatings of a child a felony, the proposed amendment would make it a felony even to cause pain to a child without actual inju-ry[,] or to bruise a child. That lesser conduct should not be punishable by a felony conviction.

[The] proposed amendment ... would make a ... felon of a person who one time "recklessly cause[d] physical injury" to a child under the age of 10.... The difficul-ty with the proposed revision is that physi-cal injury is very broadly defined as "a physical pain or [any] impairment of a physical condition." AS 11.81.900(b)[ (45) ]. Therefore, if this amendment becomes law, any person can be ... convicted [of a] felon[y] for reck-lessly causing pain to a child, even when the child suffers no actual injury whatsoev-er[,] or [for] negligen[tly] caus[ing] pain to a child by means of a dangerous instru-ment.

Even the most caring and loving person who is around a child might sometimes recklessly cause ... pain to that child. A person who angrily briefly touches a child[,] causing pain but no actual injury[,] would become a ... felon. [Moreover,] under Alaska law, an automobile is a dan-gerous instrument. Even the most caring and loving person ... might negligently cause pain to a child by causing an automo-bile accident[, even though] there was no ... injury whatsoever to the child because the child was buckled in a seat belt.... A person who slammed a child's finger in a car door would become a ... felon under this law. A relatively minor lapse by an ordinarily caring parent or other person should not cause the person to suffer a felony conviction.

Accordingly, the Trust proposed that the new offense be limited to "physical injury that requires medical treatment".

Apparently responding to the Trust's rec-ommendation, the House Judiciary Commit-tee re-wrote Section 4 of House Bill 396 to make the proposed offense "recklessly ...

---

1. See *www.alaskatriallawyers.org/ak/in-dex.cfm?event=showPage & pg=About* for a brief history of the organization.

caus[ing] physical injury to a child under 10 years of age [if] the injury reasonably requires medical treatment". CSHB 396(Jud), § 4.

In its "Sectional Analysis" of the bill, the Judiciary Committee described the purpose of Section 4:

> [This] section elevates what is currently classified as fourth[-]degree assault to third[-]degree assault if an offender is 18 years of age or older and [either] repeatedly assaults a child under the age of 10, or assaults a child under 10 and the assault requires medical treatment. This amendment is in response to several recent Anchorage cases[,] including one in which an infant had 56 different bruises on its body caused by a series of beatings committed over a three[-]week time period[,] and one in which a 5[-]year[-]old child was intentionally burned by being placed in a bath of scalding water. Because there was not a substantial risk that either child would die[,] and [because] neither child was permanently disfigured, [neither injury qualified as "serious physical injury" as defined in AS 11.81.900(b)(55), and thus] the offenders could only be charged with misdemeanors [i.e., fourth-degree assault]. [This section makes such conduct] third[-]degree assault[,] a class C felony.

But neither the bill itself nor the Judiciary Committee's accompanying analysis offered a definition of "medical treatment".

*The problem presented in this appeal: ascertaining the meaning of "treatment" in AS 11.41.220(a)(1)(C)*

The State prosecuted Wells under this new provision of the third-degree assault statute, alleging that Wells had recklessly caused head injuries to a nine-month-old infant and that these injuries had "reasonably required medical treatment".

Viewing the evidence in the light most favorable to the State, Wells inflicted multiple injuries on a nine-month-old infant over a period of two weeks, resulting in numerous bruises to the infant's face, scalp, and ears. When the child's mother brought him to the hospital, doctors were concerned that the child might have significant internal injuries, so they performed blood tests and a CAT scan as diagnostic measures. Fortunately, the child had no significant injuries; the doctors concluded that the child was medically stable and that the child's bruises would heal on their own.

The State and Wells disagree as to whether this medical examination and diagnostic testing constituted "treatment".

The State argues that, because the legislature failed to provide a definition of "treatment", we should interpret the statute using the common definition of that term. The State relies on the first sentence of AS 01.10.040(a), which states: "Words and phrases [in statutes] shall be construed ... according to their common and approved usage." [2]

According to the State, the "common" or dictionary meaning of "treatment" includes medical examinations and diagnostic testing. But as can be seen from the four dictionary definitions quoted by the State in its brief, various dictionaries have differing definitions of "treatment". Some dictionaries define the word broadly enough to include diagnostic efforts, but other dictionaries appear to limit the word to actions taken to treat or cure a medical condition after it has been diagnosed.[3]

In short, the State's brief overstates the matter when it declares, "These definitions

---

**2.** See *Lynch v. McCann*, 478 P.2d 835, 837 (Alaska 1970); *Lambert v. State*, 694 P.2d 791, 793 (Alaska App.1985) (when the legislature uses a word or phrase without defining it, a court should normally assume that the legislature intended the word or phrase to have its common, ordinary meaning).

**3.** Compare *Merriam–Webster Collegiate Dictionary* (11th ed.2003), p. 1333 ("car[ing] for or deal[ing] with [a health problem] medically or surgically"); *Webster's New World College Dictionary* (4th ed.2000), p. 1525 ("medical, surgical, or cosmetic care, esp[ecially] a systematic course of this"); *Oxford American Dictionary* (2003), p. 1626 ("application of medical care or attention to a patient"); *American Heritage Dictionary of the English Language* (4th ed.2000), p. 1838 ("administration or application of remedies to a patient for a disease or injury; medicinal or surgical management; therapy").

make clear that treatment includes not only ... remedial care, but also diagnostic care." Rather, these definitions are ambiguous concerning the issue raised in this appeal.

Moreover, AS 01.10.040(a) does not direct us to always adopt the "common" usage of words or phrases. The statute has a second sentence: "Technical words and phrases[,] and those which have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to [that] peculiar and appropriate meaning."

Medical literature draws a distinction between, on the one hand, examination and testing for purposes of "diagnosis" and, on the other, "treatment". By searching the internet, one can find literally thousands of books and articles whose titles refer to "diagnosis and treatment"—thus indicating a distinction between "diagnosis" (efforts to determine the nature and extent of a medical condition) and "treatment" (efforts to cure or ameliorate a medical condition).

Our own supreme court appears to have used the terms "diagnosis" and "treatment" in this same way. For example, in *Bradbury v. Chugach Electric Ass'n*, 71 P.3d 901, 905 (Alaska 2003), the court stated: "Two physicians, Dr. Kenneth Flora and Dr. David Nelson, testified on behalf of Chugach Electric. Dr. Flora is a hepatologist whose subspecialty is the diagnosis and treatment of chronic liver disease."

Moreover, the Alaska Legislature has enacted statutes that use the word "treatment" as meaning something distinct from "diagnosis". See AS 18.20.130(3), which defines the word "hospital" as "an institution or establishment, public or private, devoted primarily to providing *diagnosis, treatment, or care*". (Emphasis added) And AS 25.20.025(a)(4) declares that all minors (even those who are unemancipated and who are still living with a parent or guardian) have the legal authority to consent to a broad range of medical services and treatments associated with sexual activity (except abortion), including *"diagnosis, prevention or treatment* of pregnancy,

and ... *diagnosis and treatment* of venereal disease." (Emphasis added)

This same distinction is found in Alaska Evidence Rule 504(b), which states that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of *diagnosis or treatment* of the patient's physical, mental or emotional conditions...." (Emphasis added)

Finally, this Court's decision in *S.R.D. v. State*, 820 P.2d 1088 (Alaska App.1991), hinges on the distinction between diagnostic efforts and "treatment". In *S.R.D.*, a mother was convicted of criminal non-support, AS 11.51.120(a), for failing to provide her children with "necessary medical attention" after the children were injured by acts of physical abuse perpetrated by her husband. In each instance, "[medical] examinations revealed injuries resulting from [the] abuse, but the injuries did not require actual treatment." [4]

On appeal, the mother claimed that the evidence did not establish her guilt of criminal non-support "because neither child was found to require any medical treatment".[5] This Court rejected the mother's argument because the criminal non-support statute does not speak of a parent's failure to obtain "treatment" for their child, but rather a parent's failure to obtain "necessary ... medical attention". *See* AS 11.51.120(b). We held that "medical attention" was a broader concept than "treatment" because it also included medical examinations for diagnostic purposes:

> We agree with the state that "attention" must be construed more broadly than "treatment." It is conceivable that children may suffer injuries sufficiently threatening to require a medical examination, even if that examination ultimately discloses no need for treatment.
>
> In the present case, evidence concerning [the children's] injuries and the manner in which those injuries were inflicted was sufficient, when viewed in the light most favorable to the state, to permit a reasonable juror to infer that, even though no treat-

---

**4.** *S.R.D.*, 820 P.2d at 1090.

**5.** *Id.*

ment was required, medical attention was actually necessary to rule out the possibility of life-threatening or potentially disabling conditions. The trial court did not err in declining to enter a judgment of acquittal as to these two counts.

*S.R.D.,* 820 P.2d at 1090–91.

Based on the foregoing, I conclude that we must reject the State's proposed definition of "treatment" and instead adopt the narrower definition reflected in these statutes, court rules, and court decisions.

First, because the third-degree assault statute uses the phrase "medical treatment", we are searching for the meaning of "treatment" not in its general context, but rather in its medical context. And in that medical context, both the Alaska Legislature (in statutes) and the Alaska judiciary (in court rules and in court decisions) have used "treatment" in a narrow sense—as meaning something distinct from diagnostic efforts. When a word or phrase has previously been legislatively defined or judicially construed in a particular way, we are to presume (in the absence of evidence to the contrary) that later-enacted statutes carry forward the existing meaning of that word or phrase.[6]

Second, to the extent that the meaning of "treatment" remains ambiguous, we must interpret it in favor of the defendant and against the State. When the scope of a criminal statute remains unclear or ambiguous after it has been subjected to legal analysis, we are bound to construe the statute against the government—that is, construe it so as to limit the scope of criminal liability.[7]

At Wells's trial, the judge gave the jury no instruction concerning the meaning of "treatment", and the prosecutor argued to the jury that "treatment" included the examination and diagnostic testing in this case. This argument, as a matter of law, was incorrect. I therefore agree with my colleagues that Wells's conviction for third-degree assault must be reversed.

---

**6.** *Gillispie v. Beta Construction Co.,* 842 P.2d 1272, 1273 (Alaska 1992); *see City of Fairbanks v. Schaible,* 375 P.2d 201, 207–08 (Alaska 1962); *Patterson v. State,* 708 P.2d 712, 716 (Alaska App.1985); *and see Hart v. State,* 702 P.2d 651, 659 (Alaska App.1985).

**7.** *See Brookins v. State,* 600 P.2d 12, 17 (Alaska 1979); *State v. ABC Towing,* 954 P.2d 575, 579 (Alaska App.1998); *Magnuson v. State,* 843 P.2d 1251, 1253 (Alaska App.1992).